1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

E-FILED 01.11.12

JS - 6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

LUIS MIRELES, et al.,

               Plaintiffs,

      vs.

WELLS FARGO BANK, N.A., a national banking association; WELLS FARGO HOME MORTGAGE, a national banking association; AMERICA'S SERVICING COMPANY, a national banking association; WACHOVIA MORTGAGE, FSB, a national banking association; WACHOVIA BANK, FSB, f/k/a WORLD SAVINGS BANK, FSB-TX, a national banking association; GOLDEN WEST FINANCIAL CORPORATION, a Delaware corporation; WORLD SAVINGS BANK, FSB, a national banking association; WORLD SAVINGS, INC., a California corporation; CAL-WESTERN RECONVEYANCE CORPORATION, a California corporation; and DOES 1 through 1000, inclusive,,

               Defendants.

) CASE NO. CV 11-07720 MMM (FMOx)
)
)
)
) ORDER GRANTING PLAINTIFFS'
) MOTION TO REMAND; DENYING
) DEFENDANTS' MOTION TO DISMISS
) AS MOOT
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

On August 16, 2011, plaintiffs filed this action in Los Angeles Superior Court.[1]

Defendants removed the case to this court on September 16, 2011, asserting that the action was

[1] Notice of Removal ("Removal"), Docket No. 1 (Sept. 16, 2011), Exh. A ("Complaint").

a "mass tort" action and invoking jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d).[2]  Defendants also invoked the court's diversity jurisdiction under 28 U.S.C. § 1332(a).[3]  On October 14, 2011, plaintiffs filed a motion to remand.[4]  Defendants filed a motion to dismiss one week later, on October 21, 2011.[5]  Both motions are opposed.[6]

## I. FACTUAL BACKGROUND

### A.    The Complaint's Factual Allegations

The complaint in this action was filed on behalf of 108 named plaintiffs.  It is a sprawling document that is 84 pages and 387 numbered paragraphs long; many paragraphs contain multiple subparagraphs.  The court summarizes the complaint's allegations below.

The complaint alleges that "[a]s the result of an aggressive and relentlessly pursued growth strategy between 2003 and 2009," Wells Fargo Bank, N.A. ("Wells Fargo") became the fourth largest banking institution in the nation, and was the "master servicer" for loans and mortgages at issue in this action.[7]  As part of a massive scheme of investor fraud, defendants allegedly inflated property appraisals, disregarded underwriting standards, sold predatory loan products, and promised refinancing packages, all while asserting that they were "prudently lending to

---

[2]Removal, ¶ 16.

[3]*Id.*, ¶ 28.

[4]Motion to Remand ("Remand Motion"), Docket No. 13 (Oct. 14, 2011).

[5]Motion to Dismiss Complaint ("MTD"), Docket No. 21 (Oct. 21, 2011).  Cal-Western Reconveyance Corporation joined the motion to dismiss.  (Motion for Joinder in Motion to Dismiss Complaint, Docket No. 25 (Oct. 24, 2011).)

[6]Opposition to Motion to Remand Case ("Remand Opp."), Docket No. 28 (Dec. 5, 2011); Opposition to Motion to Dismiss Complaint ("MTD Opp."), Docket No. 30 (Dec. 5, 2011); Reply in Support of Motion to Remand Case ("Remand Reply"), Docket No. 33 (Dec. 12, 2011); Reply in Support of Motion to Dismiss Complaint ("MTD Reply"), Docket No. 32 (Dec. 12, 2011).

[7]Complaint, ¶ 3.

qualified homeowners."[8]  Defendants allegedly sold mortgage products to borrowers who could not otherwise meet traditional underwriting standards for such loans, and thereby contributed to a massive housing price bubble.[9]  After the bubble collapsed, plaintiffs' net worth and credit ratings were devastated.[10]  The complaint alleges that defendants are responsible for a host of other ills related to the current economic crisis, including a "mortgage meltdown in California that was substantially worse than any economic problems facing the rest of the United States,"[11] and a "knowing[ ] and systematic[ ] destr[uction of] California home values."  They assert that defendants "acted with callous or reckless disregard" for the fact that "their actions [might] cause California home prices to plummet."[12]

Defendants allegedly created risky "mortgage pools," promising investors lucrative benefits, and "managed risk through leverage and derivatives trading."[13]  They purportedly knew that the mortgage pools contained loans that were at very high risk of default.[14]  Borrowers like plaintiffs were allegedly "handcuffed" and required to accept these "dangerous products" because defendants imposed substantial early payment penalties if borrowers "tried to get out of the[ ] toxic loans [and replace them with] more stable fixed rate products."[15]

With the proceeds of TARP funds, defendants allegedly committed numerous fraudulent acts, including issuing notices of default in violation of California law, misrepresenting their

---

[8]Complaint, ¶ 9.

[9]*Id.*, ¶ 10.

[10]*Id.*

[11]*Id.*, ¶ 15.

[12]*Id.*, ¶ 16.

[13]*Id.*, ¶¶ 18-21.

[14]*Id.*, ¶ 22.

[15]*Id.*  The complaint pleads specific examples of this purportedly experienced by the named plaintiffs, who attempted to secure loan modifications or have defendants honor certain provisions of their loan contracts without success.  (*Id.*, ¶¶ 38-41.)

intention to arrange loan modifications for plaintiffs, and failing to respond to plaintiffs' communications.[16]  Plaintiffs assert that defendants have been foreclosing on their homes without proof that defendants hold the notes and deeds of trust they seek to enforce, and without being able to demonstrate ownership of notes and trust deeds in question.[17]

The complaint also contains a number of allegations regarding Wachovia, and its acquisition of Golden West Financing Corporation ("Golden West").  Golden West was an Oakland, California-based mortgage lender run by Herbert and Marion Sandler.[18]  It offered a product known as the "Pick-A-Pay" mortgage.[19]  This type of mortgage permitted borrowers to choose from multiple payment options every month: (1) full payment of interest and principal sufficient to pay down the loan over a traditional 30 year term; (2) a higher payment that would pay off the loan in 15 years; (3) an interest-only payment; or (4) a minimum payment that did not cover interest, and caused the unpaid interest to be added to the loan balance.[20]  Plaintiffs contend that the fourth option resulted in "negative amoritization," i.e., in growth of the outstanding balance over time.[21]  Plaintiffs contend that this product lured borrowers to take out loans by

---

[16]*Id.*, ¶ 26.

[17]*Id.*, ¶ 27.  The complaint contains a number of allegations regarding "MERS," which is Mortgage Electronic Registration Systems.  Plaintiffs allege that MERS operates as a registry to track servicing rights and the ownership of mortgages.  Although it contends that it is the owner of the security interests associated with the mortgages, plaintiffs allege that defendants use the company to facilitate the unlawful transfer of mortgages.  (*Id.*, ¶¶ 30-34.)  They contend that MERS's "status" was suspended in California on May 31, 2002.  (*Id.*, ¶ 36.)  They also allege that MERS has entered into a consent decree with various federal agencies to correct its allegedly "unsafe or unsound practices."  (*Id.*, ¶ 37; see also *id.*, ¶¶ 231-36 (describing the MERS consent decree in greater detail).)  The complaint pleads further details regarding MERS's participation in allegedly fraudulent mortgage transfers in later paragraphs.  (*Id.*, ¶¶ 252-66.)

[18]*Id.*, ¶ 179.

[19]*Id.*, ¶¶ 178-79.

[20]*Id.*, ¶ 179.

[21]*Id.*, ¶ 180.

4

1   offering low "teaser" rates that "ratcheted sharply upwards as interest rates increased."[22]  It was

2   purportedly marketed to unsophisticated home buyers who did not understand the financial risks

3   they faced if they entered into such a loan.[23]  Plaintiffs assert that Golden West's loans were

4   labeled the "Typhoid Mary of the mortgage industry" by *The New York Times*, and that the

5   Sandlers were included on a list of "25 people to blame for the financial crisis" by *Time*

6   *Magazine*.[24]  After Wachovia acquired Golden West, its mortgage portfolio was dominated by

7   Pick-A-Pay mortgages.  By the end of 2007, it held $120 billion of these mortgages, compared

8   with $50 billion of "traditional mortgages."[25]  More than $70 billion of Wachovia's Pick-A-Pay

9   mortgages were issued to California borrowers.[26]

10        When Wachovia announced its purchase of Golden West, the housing market was already

11   beginning to decline, and investors were concerned about their potential exposure.[27]  To reassure

12   its investors, Wachovia's officers made various representations regarding the safety and stability

13   of Golden West's portfolio, and claimed to have implemented policies to ensure that borrowers

14   could pay their loan obligations.[28]  Wachovia stated in 2007 that it did not "anticipate any

15   meaningful potential impact to earnings with the sub prime going forward."[29]

16        The Pick-A-Pay loans were allegedly concentrated in California, and when these loans

17   "reset prematurely due to the contractual breaches by Wells Fargo," many homeowners lost their

---

18

19        [22]*Id.*, ¶ 181.

20

21        [23]*Id.*

22        [24]*Id.  USA Today* allegedly described the Sandlers as "ruthless home lenders who helped
     destroy Wachovia Corp."  (*Id.*)

23

24        [25]*Id.*, ¶ 182.

25        [26]*Id.*, ¶ 191.

26        [27]*Id.*, ¶ 183-84.

27        [28]*Id.*, ¶ 186.

28        [29]*Id.*

homes through foreclosure.[30]   Plaintiffs allege that defendants were motivated to foreclose on properties quickly so that the homes could be added to their growing inventory of Real Estate Owned ("REO") properties.[31]   When Wells Fargo acquired Wachovia, it allegedly took a large 'paper loss' on Wachovia's nonperforming loans and mortgages, so that whatever money or benefits it was able to recoup on the defaulted mortgages could be reflected as new profits.[32]

Plaintiffs contend that, according to data reported pursuant to the Home Mortgage Disclosure Act, fully one-fifth of all the loans defendants made to low and moderate income borrowers, including plaintiffs, were high-cost refinance loans with an average interest rate of 9.8%; these loans purportedly represented close to $11 billion in lending.  Plaintiffs assert that the loans went directly into mortgage pools securitized and sold by defendants, who profited from the loans' "secret excessive markups."[33]

The complaint alleges that had all of this information been properly disclosed to plaintiffs, they would have behaved differently, deferring their purchase of a home and refusing to enter into expensive adjustable rate mortgages.[34]   It pleads a multitude of purportedly deceptive acts by

---

[30]*Id.*, ¶ 188.

[31]*Id.*, ¶ 188.  The complaint alleges:
"Defendants now seek to capitalize on these losses which Defendants themselves created.  For example, utilizing their rights of first right of refusal at trustee sales, Defendants have purchased the properties on which they foreclosed and retain these distressed properties at a discount to the detriment of the homeowner. These properties are being leased out to the public and are being held for sale in the Defendants' REO portfolio by their affiliate, Premiere Asset Services, awaiting the market rebound.  Defendants can thus avoid flooding the market with cheap fire-sale real estate and further devastate their own market values that they now wish to recoup, in contrast to the time frame when Defendants caused these declines in value."  (*Id.*, ¶ 189.)

[32]*Id.*, ¶ 190.

[33]*Id.*, ¶ 193.  The complaint states that the enforcement director of the SEC characterized the loans as "secret" and "excessive."  (*Id.*)

[34]*Id.*, ¶¶ 196-99.

defendants, including their failure to:

> "(1) establish due diligence policies, procedures and controls reasonably designed to detect and report instances of money laundering, (2) establish procedures to take reasonable and practicable measures to verify the identity of those applying for an account with the institution and maintain records of the information used to verify a person's identity, including name, address, and other identifying information, (3) determine and report the sources of funds used for the mortgages they originate[d] and service[d], as well as the sources of funds used to acquire any mortgages, [and] (4) disclose to Plaintiffs the identities, address and telephone numbers of transferees of their mortgages."[35]

Essentially, the complaint asserts that defendants engaged in a fraudulent scheme by offering mortgages at unsustainable loan-to-value ratios, often to individuals who they knew were a poor credit risk and at high risk of default.[36]  Defendants were allegedly aware of the consequences of their actions, and knew that defaults on a large scale would have a cascade effect and depress property values throughout the state, causing plaintiffs and other similarly situated individuals to lose the equity in their homes and have no means to refinance their mortgage or sell their home.[37]

Plaintiffs charge that defendants fraudulently misrepresented to multiple plaintiffs that they would receive assistance securing a loan modification.[38]  They also implied or stated that if plaintiffs sought a loan modification, defendants would assist them and they would often be able

---

[35]*Id.*, ¶ 200.

[36]*Id.*, ¶¶ 209-10.

[37]*Id.*, ¶ 211.  Although the complaint contains allegations that sound in fraud, the precise thrust of the claims is unclear.  The complaint alleges that certain plaintiffs were fraudulently induced to enter into mortgages they could not afford, and that defendants engaged in a broader scheme to deceive their investors and the public at large about the lax nature of their underwriting and business practices.  At different times the complaint appears to base its fraud allegations on both theories of liability.

[38]*Id.*, ¶ 212.

to obtain a modification.  Defendants purportedly made these representations with no intention of providing assistance to plaintiffs, or with knowledge that plaintiffs were not good candidates for loan modifications.[39]

Plaintiffs also allege that defendants sold the notes and deeds of trust relating to plaintiffs' properties in transactions that were unlawful or fraudulent in various ways.  The sales allegedly

"(a) [i]ncluded sales to nominees who were not authorized under law at the time to own a mortgage, including, among others, MERS;

(b) [i]nvolved misrepresentations by Defendants to investors and concealment from investors of Plaintiff[s'] true financial condition and the true value of Plaintiff[s'] home[s] and mortgage[s];

(c) [i]nvolved misrepresentations by Defendants to investors and concealment from investors of the true financial condition of other borrowers and the true value of their homes and mortgages also included in the pools;

(d) [w]ere for consideration greater than the actual value of the said notes and deeds of trust;

(e) [w]ere for consideration greater than the income stream that could be generated from the instruments even assuming a 0% default rate thereon. . . ."[40]

Plaintiffs assert that, had they been aware of defendants' conduct, they would not have entered into their mortgages or purchased homes.[41]

Plaintiffs allege that Wells Fargo is now under investigation by various governmental agencies, and is being sued in several class actions.[42]  They contend that Wells Fargo settled a lawsuit with the California Attorney General that alleged lending violations related to the Pick-A-

---

[39]*Id.*, ¶ 212.

[40]*Id.*, ¶ 218.

[41]*Id.*, ¶¶ 221-28.

[42]*Id.*, ¶ 229.

Pay loan product; the settlement purportedly contemplates that the bank will make $2 billion in loan modifications.[43]   Wells Fargo has also allegedly entered into settlements with the attorneys general of Arizona, Colorado, Florida, Illinois, Nevada, New Jersey, Texas, and Washington.[44] The company purportedly agreed to make $600 million in loan modifications, and to fund a $50 million settlement fund in order to resolve a lawsuit against Wachovia's mortgage unit.[45]   Finally, on April 5, 2011, Wells Fargo and the SEC purportedly settled charges related to "misrepresentations to investors associated with selling mortgage backed securities."[46]

The complaint describes in detail a consent decree into which Wells Fargo entered with the Office of the Comptroller of the Currency ("OCC Order").  The decree purportedly states that various federal agencies, including the Board of Governors of the Federal Reserve System, the FDIC, and the Office of Thrift Supervision, found that Wells Fargo had engaged in "unsafe or unsound practices" in its handling of foreclosure-related activities.[47]   The OCC Order allegedly states that Wells Fargo

> "filed or caused to be filed in state and federal courts numerous affidavits executed by its employees or employees of third-party service providers making various assertions, such as ownership of the mortgage note and mortgage, the amount of the principal and interest due, and the fees and expenses chargeable to the borrower, in which the affiant represented that the assertions in the affidavit were made based on personal knowledge or based on a review by the affiant of the relevant books and records, when, in many cases, they were not based on such personal knowledge

---

[43]*Id.*, ¶ 230.

[44]*Id.*

[45]*Id.*, ¶ 231.

[46]*Id.*, ¶ 232.

[47]*Id.*, ¶ 237.

or review of the relevant books and records. . . ."[48] Plaintiffs allege that under the OCC Order, Wells Fargo was required to submit to audits and execute a comprehensive plan to "reimburse homeowners who had been improperly foreclosed upon."[49]  The OCC Order purportedly concluded that Wells Fargo had litigated foreclosure proceedings and initiated non-judicial foreclosure sales without properly endorsed or assigned documents in violation of law.[50]  Plaintiffs assert that governmental investigations are ongoing; they quote from a news article stating that the Department of Housing and Urban Development's inspector general is conducting a confidential audit of the company.[51]

The complaint pleads six state law claims.  The first four, asserted by all plaintiffs, allege (1) fraudulent concealment; (2) intentional misrepresentation; (3) negligent misrepresentation; and (4) violation of the Unfair Competition Law ("UCL"), California Business & Professions Code § 17200 et seq.[52]  The complaint also pleads a wrongful foreclosure claim on behalf of eleven plaintiffs who lost their properties to foreclosure, and a breach of contract claim on behalf of nine plaintiffs who signed Pick-A-Pay mortgage loan agreements with defendants.[53]

---

[48]*Id.*

[49]*Id.*, ¶ 238-39.

[50]*Id.*, ¶ 244

[51]*Id.*, ¶ 247.

[52]This cause of action alleges a number of violations of the UCL's "unlawful" prong, including violations of federal securities laws, California Civil Code provisions governing the non-judicial foreclosure process, the U.S.A. PATRIOT Act, assorted state and federal fair debt collection statutes, and the Truth in Lending Act.  (Complaint, ¶¶ 338-62.)

[53]*Id.*, ¶¶ 290-387.  The complaint also alleges that defendants violated the Truth in Lending Act, 15 U.S.C. 1640 et seq., and the USA Patriot Act, 31 § U.S.C. § 5318, et seq., but does not allege causes of action arising under those laws.  Instead, violations of those laws (in addition to other federal laws) are alleged to satisfy the "unlawful" conduct prong of the California UCL.  (*Id.*, ¶¶ 346, 350-51.)

The subsets of plaintiffs bringing the fifth and sixth causes of action do not overlap with one another, with the exception of plaintiff Cristina Magana.  (*Id.* at 77, 81.)

**B.      The Complaint's Allegations Regarding Citizenship of the Parties and Amount in Controversy**

The complaint contains various allegations regarding the citizenship of the parties and the amount in controversy.   Paragraphs 43 through 153 are a non-alphabetized list of the 108 plaintiffs, all of whom are alleged to reside in and own property in California.[54]   Defendants are alleged to have "acted as Servicer or [in] some other control capacity over [the] processing [of plaintiffs'] loan[s]."[55]   The complaint alleges that fewer than 100 plaintiffs allege claims that "would, as to them, equal or exceed the jurisdictional amount for federal jurisdiction under 28 U.S.C. § 1332(a)."[56]

The complaint names nine defendants: Wells Fargo Bank, N.A., which is a national banking association that is chartered in Sioux Falls, South Dakota and has its primary headquarters in San Francisco, California;[57] Wells Fargo Home Mortgage, a national banking association with its principal place of business in Des Moines, Iowa;[58] America's Servicing Company, a national banking association with its principal place of business in Des Moines, Iowa;[59] Wachovia Mortgage, FSB, a national banking association with its principal place of business in Charlotte, North Carolina;[60] Wachovia Bank, FSB, formerly known as World Savings Bank, a national banking association with its principal place of business in Charlotte, North Carolina;[61] Golden West Financial Corporation, a Delaware corporation whose principal asset is World Savings Bank,

---

[54]Complaint, ¶¶ 43-151.

[55]Id.

[56]Id., ¶ 152.

[57]Id., ¶ 154.

[58]Id., ¶ 155.

[59]Id., ¶ 156.

[60]Id., ¶ 157.

[61]Id., ¶ 158.

based in Oakland, California;[62] World Savings Bank, FSB, a national banking association that was "knowingly and willingly doing business" in California;[63] World Savings, Inc., a California corporation;[64] and Cal-Western Reconveyance Corporation, a California corporation.[65]

As respects the amount in controversy, the prayer for relief seeks, *inter alia*, general and special damages, exemplary damages, statutory relief, restitution, injunctive relief and attorneys' fees.[66] The prayer for relief reiterates that

> "fewer than 100 plaintiffs are alleging claims or amounts in controversy that would, as to them[,] equal or exceed the jurisdictional amount for federal jurisdiction under 28 U.S.C. § 1332(a) and that no relief of any kind is sought under any federal statute or rule."[67]

**C.     The Notice of Removal**

**1.     CAFA "Mass Action" Jurisdiction**

Defendants Wells Fargo and Cal-Western invoke the court's jurisdiction over "mass actions" as defined in 28 U.S.C. § 1332(d)(11)(B)(i).[68] Defendants contend that 108 plaintiffs have joined to plead claims for monetary relief and seek to have those claims tried jointly because they involve common questions of law and fact.[69] Defendants dispute plaintiffs' contention that the amount in controversy does not exceed the "jurisdictional amount for federal jurisdiction," as

---

[62]*Id.*, ¶ 159.

[63]*Id.*, ¶ 160.

[64]*Id.*, ¶ 161.

[65]*Id.*, ¶ 162.

[66]*Id.* at 84.

[67]*Id.*

[68]Removal, ¶ 16.

[69]*Id.*, ¶ 17.

12

their claims exceed $5 million in the aggregate, exclusive of interest and costs.[70]  Noting that plaintiffs seek injunctive relief to prevent enforcement of their mortgage loans, defendants contend that the total unpaid principal on the loans exceeds $5 million.[71]  They also assert that each individual plaintiff's claims exceed $75,000, excluding interest.  Defendants proffer evidence that each plaintiff had a mortgage loan with an outstanding balance in excess of the jurisdictional threshold.[72]  The notice of removal cites allegations in the complaint that "similar lawsuits" have settled for billions or hundreds of millions of dollars.[73]

Defendants also assert that the minimal diversity requirement is satisfied because at least one plaintiff is a California citizen and Wells Fargo is a South Dakota citizen.[74]  The notice of removal states that Wells Fargo Home Mortgage, America's Servicing Company, Wachovia Mortgage, FSB, Golden West Corporation, and World Savings, Inc. are either are divisions of Wells Fargo or have merged into Wells Fargo and thus no longer exist for purposes of determining diversity of citizenship.[75]  Moreover, defendant Wachovia Bank, FSB, has since

---

[70]*Id.*, ¶ 20 (citing paragraph 360, which states that plaintiffs seek "restitution for all sums received by Defendants with respect [to their mortgage loans], including without limitation interest payments made by Plaintiffs [and any] fees paid to Defendants", and paragraph 25, which states that Wells Fargo "took from Plaintiffs and other borrowers billions of dollars in interest payments and fees").

[71]*Id.*, ¶ 23.

[72]*Id.*, ¶ 26.

[73]*Id.*, ¶ 24.

[74]*Id.*, ¶ 27.

[75]*Id.*, ¶¶ 9-15.  World Savings, Inc. was formerly a subsidiary of Golden West Financial Corporation, and no longer exists.  (*Id.*, ¶ 15.)  A company that merges into another company adopts the citizenship of the merged company for diversity purposes.  See *Meadows v. Bicrodyne Corp.*, 785 F.2d 670, 672 (9th Cir. 1986) (affirming that a California corporation's merger with a Delaware corporation changed the former's citizenship because "the separate existence of the disappearing corporations ceases" after a merger); *Kolker v. VNUS*, No. CV 10-00900-JF-PVT, 2010 WL 3059220, *3 (N.D. Cal. Aug. 2, 2010) ("[A]fter the merger and complete transfer of all of its assets and liabilities to Tyco, VNUS ceased to exist as a separate legal entity and thus could not properly be joined as a party to the instant action" (citation omitted)).

changed its name to Wells Fargo Bank South Central, N.A., which is a national bank with a home office in Houston, Texas.[76]  Consequently, it is a Texas citizen, which also and provides a basis for finding that the minimal diversity requirement is met.[77]

### 2.    Diversity Jurisdiction

In addition to asserting that this is a mass action over which the court has jurisdiction under CAFA, defendants invoke the court's diversity jurisdiction under 28 U.S.C. § 1332(a).  As noted, most of the named defendants have either merged into Wells Fargo or no longer exist.[78]  The only non-Wells Fargo defendant is Cal-Western.  Wells Fargo contends that Cal-Western's citizenship should be disregarded because it was fraudulently joined.  Wells Fargo asserts that Cal-Western was merely the trustee of plaintiffs' deeds of trust, which had contractual duties were limited by state law.[79]  It contends that the complaint pleads no wrongdoing by Cal-Western, and that Cal-Western is referenced explicitly in the complaint only once – in an allegation that concerns its citizenship.[80]  Wachovia Bank, FSB (formerly known as World Savings Bank, FSB), is a Texas citizen.  Wells Fargo maintains that when the citizenship of defendants that have merged into Wells Fargo or ceased to exist and Cal-Western is ignored, complete diversity exists because plaintiffs are residents of California, and defendants are either South Dakota or Texas citizens.

Defendants cite allegations in the complaint to establish that amount in controversy exceeds $75,000.  They note that paragraph 153 alleges that "fewer than 100 plaintiffs are alleging claims in amounts that would, as to them, equal or exceed" the jurisdictional threshold.[81]  As the complaint alleges claims on behalf of 108 individuals, defendants argue that this statement implies

---

[76]*Id.*, ¶ 13.

[77]*Id.*

[78]*Id.*, ¶¶ 28-30.

[79]*Id.*, ¶¶ 31-33.

[80]*Id.*, ¶ 34 ("because Plaintiffs cannot state any cause of action against Cal-Western, it was fraudulently joined. . .").

[81]Removal, ¶ 37.

that at least some plaintiffs allege damages exceeding $75,000.

Finally, defendants submit evidence that each plaintiff has placed more than $75,000 in controversy.[82]   They proffer the declaration of Michael J. Dolan, an operations analyst in Wachovia Mortgage, FSB's Portfolio Retention Department.[83]   Dolan states that each plaintiff for whom he could locate records has or had a mortgage loan exceeding $75,000 with defendants. Defendants alternatively assert that an order setting aside even one of the foreclosure sales at issue in this litigation would involve a sum greater than $75,000, and permit the court to exercise supplemental jurisdiction over causes of action involving less than that amount.[84]   See 28 U.S.C § 1367(a).

## II.  DISCUSSION

### A.    Plaintiffs' Motion for Remand

#### 1.    Legal Standards Governing Removal Jurisdiction

The right to remove a case to federal court is entirely a creature of statute.  See *Libhart v. Santa Monica Dairy Co.*, 592 F.2d 1062, 1064 (9th Cir. 1979).  The removal statute, 28 U.S.C. § 1441, allows defendants to remove when a case originally filed in state court presents a federal question or is between citizens of different states and involves an amount in controversy that exceeds $75,000.  See 28 U.S.C. §§ 1441(a), (b); see also 28 U.S.C. §§ 1331, 1332(a).  Only state court actions that could originally have been filed in federal court can be removed.  28 U.S.C. § 1441(a); see *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987); *Ethridge v. Harbor House Rest.*, 861 F.2d 1389, 1393 (9th Cir. 1988).  "[J]urisdiction in a diversity case is determined at the time of removal."  *American Dental Industries, Inc. v. EAX Worldwide, Inc.*, 228 F.Supp.2d 1155, 1157 (D. Or. 2002) (citing St. *Paul Mercury Indemnity Co. v. Red Cab Co.*,

---

[82]*Id.*

[83]Declaration of Michael J. Dolan in Support of Removal ("Dolan Decl."), Docket No. 4 (Sept. 16, 2011).

[84]Removal, ¶ 38.

303 U.S. 283, 289 (1938) ("The inability of plaintiff to recover an amount adequate to give the court jurisdiction does not show his bad faith or oust the jurisdiction. . . . Events occurring subsequent to the institution of suit which reduce the amount recoverable below the statutory limit do not oust jurisdiction").

The Ninth Circuit "strictly construe[s] the removal statute against removal jurisdiction," and "[f]ederal jurisdiction must be rejected if there is any doubt as to the right of removal in the first instance." *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992) (citing *Boggs v. Lewis*, 863 F.2d 662, 663 (9th Cir. 1988), *Takeda v. Northwestern Nat'l Life Ins. Co.*, 765 F.2d 815, 818 (9th Cir. 1985), and *Libhart*, 592 F.2d at 1064). "The 'strong presumption' against removal jurisdiction means that the defendant always has the burden of establishing that removal is proper." *Id.* (citing *Nishimoto v. Federman-Bachrach & Assocs.*, 903 F.2d 709, 712 n. 3 (9th Cir. 1990), and *Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1195 (9th Cir. 1988)).

## 2.   Requirements for Jurisdiction as a CAFA Mass Action

CAFA supplements the original removal statute, giving district courts, *inter alia*, original jurisdiction over a "mass action" in which the amount of controversy exceeds $5,000,000, exclusive of interests and costs, and minimal diversity exists. See 28 U.S.C. § 1332(d)(11)(A) ("For purposes of this subsection and section 1453, a mass action shall be deemed to be a class action removable under paragraphs (2) through (10) if it otherwise meets the provisions of those paragraphs"). 28 U.S.C. § 1332(d)(11)(B)(i) defines "mass action" as "any civil action . . . in which monetary relief claims of 100 or more persons are proposed to be tried jointly on the ground that the plaintiffs' claims involve common questions of law or fact, except that jurisdiction shall exist only over those plaintiffs whose claims in a mass action satisfy the jurisdictional amount requirements. . . ."

Essentially, "CAFA provides that a qualifying mass action 'shall be deemed to be a class action' removable to federal court under the Act, so long as the rest of CAFA's jurisdictional requirements are met. Among these requirements, the aggregate amount in controversy must exceed '$5,000,000, exclusive of interest and costs,' and at least one plaintiff must be a citizen of a state or foreign state different from that of any defendant. In addition, there must be minimal

diversity between the parties.'"   *Tanoh v. Dow Chemical Co.*, 561 F.3d 945, 952 (9th Cir. 2009) (quoting 28 U.S.C. § 1332(d)(11)(A)).

CAFA's mass action provisions contain a number of exceptions, however.  As the mass action statutes explicitly incorporate the other requirements necessary to maintain a *class* action, 28 U.S.C. § 1332(d)(11)(A), any exceptions to the court's jurisdiction under CAFA's class action provisions also apply.  See 28 U.S.C. § 1332(d)(3) (setting forth various situations in which the court may decline to exercise jurisdiction over a class action "in the interests of justice and looking at the totality of the circumstances"); *id.* § 1332(d)(4) (setting forth circumstances in which the district court is required to decline to exercise jurisdiction).   In addition, 28 U.S.C. § 1332(d)(11)(B)(i) provides that in a mass action, "jurisdiction shall exist only over those plaintiffs whose claims in a mass action satisfy the jurisdictional amount requirements under subsection (a)."

The mass action-specific exceptions are found in 28 U.S.C. § 1332(d)(11)(B), which states:

"[T]he term 'mass action' shall not include any civil action in which –

(I) all of the claims in the action arise from an event or occurrence in the State in which the action was filed, and that allegedly resulted in injuries in that State or in States contiguous to that State;

(II) the claims are joined upon motion of a defendant;

(III) all of the claims in the action are asserted on behalf of the general public (and not on behalf of individual claimants or members of a purported class) pursuant to a State statute specifically authorizing such action; or

(IV) the claims have been consolidated or coordinated solely for pretrial proceedings."

### 3.    Whether CAFA's Mass Action Requirements Are Met

The parties do not dispute: (1) that the number of plaintiffs in this action exceeds 100; (2) that "plaintiffs' claims involve common questions of law or fact," 28 U.S.C. § 1332(d)(11)(B); (3) and that the citizenship of the parties is minimally diverse, as all the plaintiffs are citizens of California and Wells Fargo Bank South Central, N.A. (formerly known as Wachovia Bank, FSB)

is a Texas citizen.[85]   The parties' disputes concerns whether the amount in controversy requirement is met, and whether various exceptions to CAFA apply.[86]

### a.   The Applicable Burden of Proof

Although the burden of proving that removal jurisdiction exists rests with defendants, the burden of proof they must satisfy differs depending on the nature of the damages allegations included in plaintiffs' complaint.   "[W]hen the plaintiff[s] fail[ ] to plead a specific amount of damages, . . . defendant[s] seeking removal 'must prove by a preponderance of the evidence that the amount in controversy requirement has been met.'"   *Lowdermilk v. United States Bank Nat'l Assoc.*, 479 F.3d 994, 998 (9th Cir. 2007) (quoting *Abrego Abrego v. The Dow Chemical Co.*, 443 F.3d 676, 683 (9th Cir. 2006) (per curiam)); see also *Guglielmino v. McKee Foods Corp.*, 506 F.3d 696, 700 (9th Cir. 2007) ("In the Jurisdiction and Venue section, it is alleged that '[t]he damages to each Plaintiff are less than $75,000.   In addition, the sum of such damages and the value of injunctive relief sought by plaintiff in this action is less than $75,000.' . . .   [B]ecause the allegation in the Jurisdiction and Venue section is not repeated in the Prayer for Relief and

---

[85]Although the complaint alleges that plaintiffs are California residents, rather than citizens, there is no indication that plaintiffs are citizens of states that would destroy minimal diversity here.

[86]At oral argument, plaintiffs invoked 28 U.S.C. § 1332(d)(11)(B)(ii)(I), which provides that federal courts do not have jurisdiction to hear cases in which "all of the claims in the action arise from an event or occurrence in the State in which the action was filed, and that allegedly resulted in injuries in that State or in States contiguous. . . ."   That provision, however, has been narrowly interpreted to refer to claims involving a "'single event or occurrence, such as an environmental accident, that gives rise to the claims of all plaintiffs.'"   *Dunn v. Endoscopy Center of Southern Nevada*, No. 2:11–cv–00560–RLH–PAL, 2011 WL 5509004, *2 (D. Nev. Nov. 7, 2011) (quoting *Lafalier v. Cinnabar Serv. Co., Inc.*, No. 10–cv–0005, 2010 WL 1486900, *4 (N.D. Okla. Apr. 13, 2010)).

The legislative history of the section confirms that this exception applies only in cases involving a single "event or occurrence," and that it explicitly excludes product liability cases, since "[t]he sale of a product to different people does not qualify as an event."   S.Rep. No. 109–14, at 47, reprinted in 2005 U.S.C.C.A .N. 3, 44.   While plaintiffs' factual allegations concern an allegedly fraudulent scheme, that scheme involved a multitude of individual transactions involving many different parties.   The claims, therefore, can hardly be said to be based on a single, unitary "event."   Because the parties did not brief this issue, no authority has been cited suggesting that 28 U.S.C. § 1332(d)(11)(B)(ii)(I) should be extended to cover circumstances such as this.   Consequently, the court declines to remand on this basis.

does not take account of attorneys' fees, accounting of moneys, or payment of back taxes and benefits, the complaint fails to allege a sufficiently specific total amount in controversy"). See also *Dupre v. General Motors*, No. CV-10-00955-RGK (Ex), 2010 WL 3447082, *2 (C.D. Cal. Aug. 27, 2010) ("As in *Guglielmino*, the complaint is facially unclear as to whether the requisite total amount in controversy has been pled, and GM 'bears the burden of establishing, by a preponderance of the evidence, that the amount in controversy exceeds [the jurisdictional amount]'").

"[I]f the complaint alleges damages in excess of the federal amount-in-controversy requirement, [however,] then the amount-in-controversy requirement is presumptively satisfied unless 'it appears to a 'legal certainty' that the claim is actually for less than the jurisdictional minimum.'" *Id.* (quoting *Abrego Abrego*, 443 at 683 n. 8). Similarly, a defendant seeking to remove an action where the complaint affirmatively limits the amount in controversy to avoid federal jurisdiction must demonstrate to a legal certainty that the amount in controversy satisfies the jurisdictional threshold. The *Lowdermilk* court outlined this variable standard of proof for two reasons. First, it noted that "federal courts . . . are courts of limited jurisdiction and . . . strictly construe [their] jurisdiction." *Id.* at 998 (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). Second, it noted the "well established [proposition] that the plaintiff is 'master of her complaint' and can plead to avoid federal jurisdiction." *Id.* at 999. Taking these principles together, the court concluded that "subject to a 'good faith' requirement in pleading, a plaintiff may sue for less than the amount she may be entitled to if she wishes to avoid federal jurisdiction and remain in state court." *Id.* (citing *St. Paul Mercury Indem. Co.*, 303 U.S. at 288-89); see also *id.* at 999 ("By adopting 'legal certainty' as the standard of proof, we guard the presumption against federal jurisdiction and preserve the plaintiff's prerogative, subject to the good faith requirement, to forgo a potentially larger recovery to remain in state court").

Here, plaintiffs do not allege the aggregate amount in controversy on their claims. They also do not allege a specific amount in controversy for *each individual* plaintiff. Instead, the complaint pleads that "*fewer than 100 plaintiffs are alleging claims or amounts in controversy that would, as to them[,] equal or exceed the jurisdictional amount for federal jurisdiction under 28*

19

*U.S.C.* § *1332(a).*"[87]   Although it appears that plaintiffs seek to avoid federal jurisdiction, the complaint neither pleads that the *total* aggregate amount in controversy is less than a certain amount, nor that each plaintiff's individual amount in controversy is less than $75,000.  Instead, the complaint alleges that some number of plaintiffs – fewer than 100 – allege an amount in controversy that, "as to them,.." does not exceed $75,000.

This manner of pleading, however, is apparently explained by plaintiffs' interpretation of certain portions of CAFA's mass action provisions.  Plaintiffs cite § 1332(d)(11)(B)(i), which states that where jurisdiction exists to hear a mass action, it "exist[s] only over those plaintiffs whose claims . . . satisfy the jurisdictional amount requirements under subsection (a)."  Plaintiffs contend this means that the court has mass action jurisdiction only when "100 or more persons" *each* place an amount in controversy that exceeds $75,000, even if the action otherwise meets CAFA's minimal diversity and aggregate amount in controversy requirements.  Defendants, by contrast, urge that the court adopt the Eleventh Circuit's view that "the $75,000 provision was not intended to bar district courts from asserting jurisdiction over the entire case if each individual plaintiff's claims do not exceed $75,000," so long as the numerosity and $5 million aggregate amount in controversy thresholds are met.  *Lowery v. Alabama Power Co.*, 483 F.3d 1184, 1205 (11th Cir. 2007).[88]

The Ninth Circuit has twice taken note of the statutory ambiguity but declined to address the question directly.  See *Abrego Abrego*, 443 F.3d at 682 (observing that the parties had raised the "thorn[y]" issue of whether "removed mass actions remain in federal court even if the plaintiffs alleging claims in excess of $75,000 do not meet the numerosity or aggregate total amount in controversy requirement of § 1332(d)," but remanding case on other grounds); see also

---

[87]Complaint at 84 (emphasis added).  See also *id.*, ¶ 153.

[88]Under the Eleventh Circuit's interpretation, the court would have to remand any individual plaintiff's claims that did not meet the $75,000 threshold.  *Lowery*, 483 F.3d at 1206-07.  Even if remanding those claims brought the aggregate amount in controversy below $5 million, however, the court would retain jurisdiction so long as CAFA's requirements were met at the time of removal.  *Id.* at 1206 (citing S. Rep. No. 109-14 at 57 (2005)).

*Tanoh*, 561 F.3d at 953 n. 4 ("In *Abrego Abrego*, we left open the question whether this clause requires that one hundred or more plaintiffs individually satisfy the $75,000 amount in controversy requirement for federal diversity jurisdiction to qualify as a 'mass action' under CAFA.  Given our disposition in this case, we once again do not decide the issue" (citation omitted)).

The court similarly concludes that addressing this difficult question of statutory interpretation is not necessary here to address the applicable burden of proof or to answer the ultimate question as to whether the court can exercise jurisdiction over this case.  As to burden of proof, to remove a mass action under CAFA, the aggregate amount in controversy for all plaintiffs must exceed $5 million.  28 U.S.C. § 1332(d)(2).  The complaint here neither affirmatively alleges an amount in controversy of less than $5 million, nor pleads specific amounts in controversy as to each individual plaintiff.  The only allegation plaintiffs offer is that some number of plaintiffs "fewer than 100" alleges an amount in controversy less than $75,000.  This is insufficient to quantify the aggregate amount placed at issue by the complaint.

The ambiguity of the pleading places it squarely within the rule articulated in *Abrego Abrego* and *Guglielmino* that defendants must show by a preponderance of the evidence that the amount in controversy requirement is satisfied.  See, e.g., *Guglielmino*, 506 F.3d at 701.

> **b.**      **Whether Defendants Have Met Their Burden of Proof as to Amount in Controversy**

The court thus examines whether defendants have met their burden of showing by a preponderance that the amount in controversy exceeds $5 million.  As noted, the only proof defendants proffer is the Dolan declaration.  Dolan states that as an operations analyst in Wachovia Mortgage, FSB's portfolio retention department, he has "custody over and access to various business records of Wells Fargo, and [is] familiar with Wells Fargo's business practices and business records."[89]  He asserts that based on his review of those records, he has "determined that the total unpaid principal on the outstanding mortgage loans at issue in this litigation is well in

---

[89]Dolan Decl., ¶ 2.

excess of $5,000,000."[90]   No further explanation is provided and the declaration attaches no records or documents supporting Dolan's statement.   Nor does Dolan identify the records he reviewed to reach this conclusion.

Dolan also states that "each of the Plaintiffs has, or at one time had, a mortgage loan with an outstanding principal balance in excess of $75,000."[91]   Dolan does not specify the amount of any plaintiff's outstanding balance, how many have past balances as opposed to current balances, nor what the amounts of any current balances may be.   With respect to the plaintiffs who allege wrongful foreclosure claims, Dolan has determined that at the time their properties were sold at foreclosure, "each loan had an unpaid principal balance in excess of $75,000."[92]   Once again, however, no documents are provided supporting this contention.

Dolan notes that he could find no records for thirteen of the 108 plaintiffs and was unable to "locate any loans in [their] names."[93]   Two of the individuals about whom he lacks information allege wrongful foreclosure claims.[94]

Defendants contend that Dolan's declaration is sufficient to demonstrate an aggregate amount in controversy exceeding $5 million.   This contention is largely based on their assertion that whatever the allegations of the complaint, plaintiffs actually seek to enjoin foreclosure of their properties or to unwind foreclosures that have already taken place.   As evidence of this, they cite allegations challenging defendants' rights to enforce the mortgages and foreclose on plaintiffs'

---

[90]*Id.*, ¶ 11.

[91]*Id.*, ¶ 12.

[92]*Id.*

[93]*Id.* at n. 1.   These plaintiffs are Rosa Courtney, Rebecca Sierra, David and Gaviela Zamora, Daniel and Cosmina Spatacean, Paul and Cynthia Pease, Renan and Jeannette Pulicio, and Terri A. and Rhonda K. Penkert.   (*Id.*)

[94]*Id.* at n. 2.   These two individuals are Rosa Courtney and Katherine Ward.

22

1   properties.[95]  These allegations, defendants contend, indicate that plaintiffs have placed the entire

2   value of their mortgages at issue.  See *Chapman v. Deutsche Bank Nat. Trust Co.*, 651 F.3d 1039,

3   1045 n. 2 (9th Cir. 2011) ("Here, the object in litigation is the Property, which was assessed at

4   a value of more than $200,000, and therefore satisfies the amount-in-controversy requirement");

5   *Garfinkle v. Wells Fargo Bank*, 483 F.2d 1074, 1076 (9th Cir. 1973) (treating the value of real

6   property as the amount in controversy in an action to enjoin a foreclosure sale).  "Even if the

7   property at issue has already been sold in foreclosure by the defendant, as is the case here, the

8   property may still be the object of the litigation when the plaintiff sues for injunctive [or

9   declaratory] relief."  *Reyes v. Wells Fargo Bank, N.A.*, No. C-10-01667 JCS, 2010 WL 2629785,

10  *4-5 (N.D. Cal. June 29, 2010).   See also *Kehoe v. Aurora Loan Services LLC*, No.

11  3:10-cv-00256-RCJ-RAM, 2010 WL 4286331, *3-4  (D. Nev. Oct. 20, 2010) ("Based on the

12  foregoing, the Court finds that the amount in controversy exceeds the jurisdictional limit.  In cases

13  seeking injunctive relief from a foreclosure sale, the value of the property at issue is the object of

14  the litigation for the purposes of determining the amount in controversy.  In this matter, Plaintiffs

15  are seeking to undo a non-judicial foreclosure sale in which the property was sold for

16  approximately $981,000.  Because the object of the litigation is worth significantly more than

17  $75,000, the amount in controversy requirement has been met and this case was properly

18  removed"); *Barrus v. Recontrust Co., N.A.*, No. C11–618–RSM, 2011 WL 2360206, *3 (W.D.

19  Wash. June 9, 2011) ("Here, Plaintiffs seek a declaration 'canceling' the Deed of Trust that

20  secures their home loan and an injunction of the upcoming foreclosure sale of their home.  The

21

22  _____

23      [95]See, e.g., Complaint, ¶ 27 ("Defendants lack the legal right to enforce the foregoing because they have not complied with disclosure requirements intended to assure that mortgages are funded with monies obtained lawfully"); *id.*, ¶ 29 ("Accordingly, Defendants are not and were not at the relevant times allowed legally to enforce the notes or deeds of trust"); *id.*, ¶ 202 ("Defendants have made demand for payment on the Plaintiffs with respect to Plaintiffs' properties at a time when Defendants are incapable of establishing . . . who owns the promissory notes Defendants are purportedly servicing"); *id.*, ¶ 250 ("Defendants continue to demand payment and to foreclose and threaten to foreclose on Plaintiffs, despite the facts that . . . Defendants have no proof that they own the notes and deeds of trust they seek to enforce . . ."); *id.*, ¶ 321 ("Defendants seek to enforce the loans and mortgages irrespective of this massive fraud").  The

loan amount – the object of the litigation – is $286,750. Accordingly, the amount in controversy is well over the $75,000 threshold" (citations omitted)); *Delgado v. Bank of America Corp.*, No. 1:09cv01638 AWI DLB, 2009 WL 4163525, *6 (E.D. Cal. Nov. 23, 2009) (accepting an affidavit submitted by defendants that appraised the property plaintiffs sought to reclaim at more than $75,000 as evidence that the amount in controversy requirement was satisfied).

While the complaint is hardly a model of clarity, the court believes that defendants have not read it accurately. It is true that the pleading contains various allegations questioning defendants' right to enforce the mortgages in question. A closer examination of each of the claims and causes of action, however, does not support the view that plaintiffs seek injunctive or declaratory relief that places the entire value of their mortgages at issue. See *Naiyan v. Sodexo, Inc.*, No. CV 10–9872 PSG (CWx), 2011 WL 1543371, *2 (C.D. Cal. Apr. 25, 2011) (assessing the amount in controversy by examining each claim). The first through third causes of action allege claims for fraudulent concealment, intentional misrepresentation, and negligent misrepresentation respectively. Plaintiffs do not seek injunctive relief on these claims, but rather damages caused by plaintiffs' reliance on defendants' misconduct. While the complaint contends that defendants do not have a valid right to enforce the mortgages, these allegations are included to show that defendants misrepresented the facts by holding themselves out as the owners of valid loans and mortgages. Plaintiffs describe the damages they seek as the "loss of [their] equity investments,"[96] i.e., the "loss of equity in their houses, costs and expenses related to protecting themselves, reduced credit scores," etc.[97] Defendants' evidence does not quantify these damages in any respect. Rather, in two somewhat conclusory paragraphs, Dolan addresses only the amount of the mortgage loans that 95 of the plaintiffs had or have; he provides no information regarding the thirteen plaintiffs for whom he could find no records. The fact that plaintiffs "at one time had" loans exceeding $75,000 says nothing about their current outstanding mortgage balances, which potentially could be below that amount.

---

[96]Complaint, ¶ 319.

[97]*Id.*, ¶¶ 302, 325, 336.

The fourth cause of action arises under the UCL, and seeks restitution "for all sums received by Defendants with respect [to the mortgages], including, without limitation, interest payments . . . , fees . . . , and premiums received upon selling the mortgages at an inflated value."[98] The claim seeks injunctive relief to prevent defendants "from any further concealment with respect to the sale of notes and mortgages," and to enjoin them from further unlawful conduct.[99] Like the three claims that preceded it, this cause of action does not put the entire value of plaintiffs' properties at issue, nor does it seek to block enforcement of the mortgages. Defendants have adduced no evidence regarding the aggregate value of payments or interest they received.

The fifth cause of action, which is asserted by eleven plaintiffs, alleges wrongful foreclosure. Defendants were, as noted, unable to provide any information about two of these individuals; thus, Dolan's calculation concerns nine individuals only. The claim alleges that "[p]laintiffs were dispossessed of the value of [their] homes" and that the foreclosure sales were void.[100] The sixth and final cause of action, which is asserted by a different subset of nine plaintiffs who entered into Pick-A-Pay mortgage agreements with defendants, alleges a breach of contract claim.[101] These plaintiffs contend that defendants breached the mortgage contract by prohibiting them from choosing two of the four payment options available under the contract, which caused them to default and led to the foreclosure of their homes, or the "commenc[ement] [of] the foreclosure process."[102] It also alleges that defendants' material breaches damaged plaintiffs by "[c]ausing Plaintiffs' properties to enter into the foreclosure process and be

---

[98]Complaint, ¶ 360.

[99]*Id.*, ¶ 361.

[100]*Id.*, ¶ 374.

[101]These plaintiffs are Allen and Rose Bickerstaff, Stirling and Michelle Hale, Robert and Geraldine Harrick, Cristina Magana, and William and Janet Schraner. (Complaint at 81.)

[102]*Id.*, ¶ 386.

1    foreclosed. . . ."[103]   The prayer for relief seeks injunctive relief under the fourth cause of action

2    and "any other causes of action for which such relief may be available. . . ."   It is thus possible

3    that plaintiffs seek to enjoin or set aside foreclosure sales.[104]

4           Unlike the claims that precede them, the fifth and sixth claims – which are asserted by

5    small subsets of individual plaintiffs – implicate the foreclosure or threatened foreclosure of their

6    homes and may fairly be said to place the full value of their properties into controversy.   The

7    Dolan declaration contains minimal information about nine of the plaintiffs who allege wrongful

8    foreclosure.   It reports only that each of their "loan[s] had an unpaid principal balance in excess

9    of $75,000."[105]   The declaration contains no information concerning the nine individuals who have

10   pled a breach of contract claim.   The court has no information that would permit it to conclude

11   that defendants have shown by a preponderance of the evidence that the wrongful foreclosure

12   claims involves aggregate damages of more than $5 million.   The same is true of the breach of

13   contract claims.   Defendants' evidence is thus insufficient to meet their burden.

14          Defendants also contend that the amount in controversy is satisfied by allegations that

15   purport to describe the magnitude of the fraudulent scheme at issue here.   Specifically, defendants

16   cite paragraphs 25 and 360 of the complaint.   Paragraph 25 states that "Wells Fargo and the other

17   Defendants took from Plaintiffs and other borrowers billions of dollars in interest payments and

18   fees."[106]   Because plaintiffs seek restitution of "all sums received by Defendants with respect [to

19   their mortgages], including without limitation interest payments [and] fees,"[107] defendants assert

20   that they have placed "billions of dollars" in controversy.   This interpretation does not withstand

21   scrutiny.   As noted, the complaint alleges a wide-ranging fraudulent scheme involving the homes

22

23   _____

        [103]*Id.*, ¶ 384(c).

24
        [104]*Id.* at 84.
25

26      [105]Dolan Decl., ¶ 12.

27      [106]Complaint, ¶ 25.

28      [107]*Id.*, ¶ 360.

26

of individuals across the country.  Given this fact, the allegation that "[p]laintiffs *and other borrowers*" were collectively deprived of "billions of dollars" does not show that the amount in controversy *in this litigation* is similarly huge.  Because this is a mass action, rather than a class action, the only damages at issue are those the *named plaintiffs* suffered.  Allegations regarding borrowers other than plaintiffs are not relevant to calculating the amount in controversy.

Defendants' reliance on other allegations concerning sizable settlements is similarly unavailing.[108]  The complaint contains a number of allegations concerning settlements into which Wells Fargo entered to resolve other lawsuits.  Paragraph 230, for example, alleges that Wells Fargo settled a lawsuit filed by the California Attorney General that alleged predatory practices involving the Pick-A-Pay mortgages; the bank purportedly agreed to make $2 billion in loan modifications.[109]  The next paragraph alleges that Wells Fargo agreed to settle "a lawsuit" by making $600 million in loan modifications and "fund[ing] a $50 million settlement fund."[110]  Paragraph 247 refers to a *Huffington Post* article, which purportedly stated that Wells Fargo "had agreed to pay $85 million to settle civil claims. . . ."[111]  Plaintiffs assert that these settlements were in cases in which government agencies and private parties asserted claims of wrongdoing "similar to the wrongful acts alleged" in this case.[112]

Defendants contend that plaintiffs' allegations concerning these settlements constitute admissions that the amount in controversy in *this* litigation exceeds $5 million.  While settlements and jury verdicts in similar cases can provide evidence of the amount in controversy, the cases must be factually identical or, at a minimum, analogous to the case at issue.  See *Simmons v. PCR Technology*, 209 F.Supp.2d 1029, 1034 (N.D. Cal. 2002) (considering damages awarded in a "not

---

[108]Removal, ¶ 24 (quoting Complaint, ¶¶ 230-31, 247).

[109]Complaint, ¶ 230.

[110]*Id.*, ¶ 231.

[111]*Id.*, ¶ 247.

[112]*Id.*, ¶ 228.

perfectly analogous" case as evidence "that emotional distress damages in a successful employment discrimination case may be substantial"); *Conrad Associates v. Hartford Accident & Indemnity Co.*, 994 F.Supp. 1196, 1200 (N.D. Cal. 1998) (accepting evidence of jury verdicts on analogous punitive damages claims as sufficient to show that the amount in controversy requirement was met). Defendants here proffer no evidence that the lawsuits and settlements alleged in the complaint are factually or legally similar to plaintiffs' claims. The complaint alleges few details concerning the settlements; there is absolutely *no* indication that the claims purportedly settled were similar in size or scope to those asserted in this litigation. At oral argument, Wells Fargo's lawyer described this case as a "microcosm" of the cases referenced in the complaint; it appears therefore that even defendants understand that the claims at issue here are a subset, and most probably a small subset, of the claims at issue in the governmental lawsuits referenced in the complaint. Similarly, the fact that Wells Fargo has allegedly paid $85 million to settle all or some of the civil claims filed against it speaks not at all to the value of the claims of the 108 plaintiffs who have sued in this case. The court declines defendants' invitation to extrapolate from vague allegations regarding settlements of litigation initiated by governmental entities – which obviously alleged misconduct larger in scope than plaintiffs allege here – or from allegations regarding the overall sums defendants have purportedly paid to settle similar claims – that the amount in controversy here exceeds $5 million. Defendants' argument obfuscates the fact that they have failed to proffer concrete evidence regarding the actual amount in controversy in this case. It is defendants' burden to adduce evidence regarding the amount in controversy. The allegations in plaintiffs' complaint that they cite do not suffice to satisfy this burden.

"The strong presumption against removal jurisdiction necessarily means that federal jurisdiction 'must be rejected if there is any doubt as to the right of removal in the first instance.'" *Sauer v. Prudential Ins. Co. of Am.*, No. 2:11–cv–08699–JHN–RZ, 2011 WL 5117772, *1 (C.D.Cal. Oct. 28, 2011) (quoting *Gaus*, 980 F.2d at 566); see also *Haase v. Aerodynamics Inc.*, No. 2:09-cv-01751-MCE-GGH, 2009 WL 3368519, *2 (E.D.Cal. Oct. 19, 2009) ("[I]f there is any doubt as to the right of removal in the first instance, remand must be granted"). As defendants have failed to meet their burden of proving that the amount in controversy exceeds $5

million by a preponderance of the evidence, the court lacks jurisdiction over this case as a CAFA mass action.[113]

_____

[113]Given the court's conclusion regarding defendants' proof of the amount in controversy, it declines to address the parties' arguments as to whether CAFA's "local controversy" and "home state" exceptions apply here. The court observes, however, that the "local controversy" exception may apply here. This exception requires that the district court decline jurisdiction over any class action in which:

"(i)(I) greater than two-thirds of the members of all proposed plaintiff classes in the aggregate are citizens of the State in which the action was originally filed;
"(II) at least 1 defendant is a defendant –
    "(aa) from whom significant relief is sought by members of the plaintiff class;
    "(bb) whose alleged conduct forms a significant basis for the claims asserted by the proposed plaintiff class; and
    "(cc) who is a citizen of the State in which the action was originally filed; and
"(III) principal injuries resulting from the alleged conduct or any related conduct of each defendant were incurred in the State in which the action was originally filed; and
"(ii) during the 3-year period preceding the filing of that class action, no other class action has been filed asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons." 28 U.S.C. § 1332(d)(4)(A).

Here, all of the plaintiffs are California citizens. In Part II.A.4.a.iii, *infra*, the court concludes that Cal-Western has not been fraudulently joined. Consequently, at least one defendant is also a California citizen. The complaint pleads a number of claims against each of the defendants, including Cal-Western, and seeks a variety of forms of relief from them in the aggregate. The complaint thus seeks "significant relief" from Cal-Western. In addition, Cal-Western's conduct "forms a significant basis for the claims asserted" by plaintiffs, given that it purportedly played a key role in effecting a number of the allegedly wrongful foreclosures, and also purportedly conspired with other defendants to commit assorted violations of California's Unfair Competition Law. See *Kaufman v. Allstate New Jersey Ins. Co.*, 561 F.3d 144, 155 (3d Cir. 2009) ("The provision does not require that the local defendant's alleged conduct form a basis of each claim asserted; it requires the alleged conduct to form a significant basis of all the claims asserted"). Moreover, the requirement that "principal injuries resulting from the alleged conduct . . . were incurred in the State" in which the action was filed is satisfied, 28 U.S.C. § 1332(d)(4)(A)((i)(III), as all plaintiffs are California citizens who allege injuries resulting from mortgage transactions consummated within the state.

For this exception to apply, it must be the case that "no other class action . . . asserting the same or similar factual allegations" have been filed in the last three years. Defendants contend that *Nelson v. Wells Fargo Bank, N.A.*, CV No. 11-05573 DMG (Ssx), alleges "almost identical"

### 4.   Whether the Court Has Diversity Jurisdiction to Hear this Action

Defendants also invoke the court's diversity jurisdiction over each of the individual plaintiffs' claims.[114]  "The district courts . . . have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. . . ." 28 U.S.C. § 1332(a); see also *Matheson v. Progressive Specialty Ins. Co.*, 319 F.3d 1089, 1090 (9th Cir. 2003) ("[J]urisdiction founded on [diversity] requires that the parties be in complete diversity and the amount in controversy exceed $75,000").   In any case where subject matter jurisdiction is premised on diversity, there must be complete diversity, i.e., all plaintiffs must have citizenship different than all defendants. See *Strawbridge v. Curtis*, 7 U.S. (3 Cranch) 267 (1806); see also *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 68 & n. 3 (1996).

The parties dispute a number of issues concerning diversity jurisdiction.  First, they disagree as to whether Wells Fargo should be considered a California citizen; if it is, this would defeat complete diversity.  Second, defendants contend that plaintiffs have fraudulently joined Cal-Western Reconveyance; if this is not the case, the fact that it is a defendant would also defeat diversity.  Finally, the parties dispute whether defendants have adequately proved the amount in controversy.  The court addresses each issue in turn.

### a.   Whether the Complete Diversity Requirement Is Satisfied

---

facts against Wells Fargo. (Remand Opp. at 20.)  Despite the purported identity of facts, neither defendants nor plaintiffs sought to relate this case to *Nelson*, or to consolidate the actions before the same judge.  The *Nelson* case involved different defendants represented by different counsel. Judge Gee evaluated whether the two cases were related, and concluded that while they "share[d] some common defendants and legal theories, there is no overlap of plaintiffs and no overlap with respect to *certain major defendants*."  (Order re: Transfer, Docket No 34 (Dec. 21, 2011) (emphasis added).)  Given the many apparent dissimilarities between the two cases, it is not at all clear that the *Nelson* mass action precludes this court's exercise of jurisdiction under CAFA.

Plaintiffs raised this issue in its motion, but did not respond to defendants' arguments against it in their reply brief, instead focusing on the issue of Wells Fargo's citizenship.  It is plaintiffs' burden to demonstrate that this exception applies.  *Serrano v. 180 Connect, Inc.*, 478 F.3d 1018, 1024 (9th Cir. 2007).  The court notes the possible applicability of the exception, however, as it may provide yet another reason why CAFA's mass action provisions do not provide a jurisdictional basis for hearing this case in federal court.

[114]Removal, ¶ 28.

i.  **Legal Standard Governing the Citizenship of National Banking Associations for Diversity Purposes**

28 U.S.C. § 1348 states:

"The district courts shall have original jurisdiction of any civil action commenced by the United States, or by direction of any officer thereof, against any national banking association, any civil action to wind up the affairs of any such association, and any action by a banking association established in the district for which the court is held, under chapter 2 of Title 12, to enjoin the Comptroller of the Currency, or any receiver acting under his direction, as provided by such chapter. All national banking associations shall, for the purposes of all other actions by or against them, be deemed citizens of the States in which they are respectively located."

In *Wachovia Bank v. Schmidt*, 546 U.S. 303 (2006), the United States Supreme Court considered whether, as used in § 1348, "located . . . signal[ed] . . . that the bank's citizenship is determined by the place designated in the bank's articles of association as the location of its main office," or rather "that a national bank is a citizen of every State in which it maintains a branch[.]" *Id.* at 306-07. The Court recognized that "'located' is not a word of 'enduring rigidity,' but one that gains its precise meaning from context," and therefore considered the unique historical circumstances giving rise to Congress's adoption of § 1348. *Id.* at 307 (citing *Citizens & Southern Nat. Bank v. Bougas*, 434 U.S. 35, 44 (1977)). It reasoned:

"When Congress first authorized national banks in 1863, it specified that any 'suits, actions, and proceedings by and against [them could] be had' in federal court. National banks thus could 'sue and be sued in the federal district and circuit courts solely because they were national banks, without regard to diversity, amount in controversy or the existence of a federal question in the usual sense.' State banks, however, like other state-incorporated entities, could initiate actions in federal court only on the basis of diversity of citizenship or the existence of a federal question. Congress ended national banks' automatic qualification for federal jurisdiction in

31

1882.  An enactment that year provided in relevant part:

'[T]he jurisdiction for suits hereafter brought by or against any association established under any law providing for national-banking associations . . . shall be the same as, and not other than, the jurisdiction for suits by or against banks not organized under any law of the United States which do or might do banking business where such national-banking associations may be doing business when such suits may be begun[.]' . . .

Under this measure, national banks could no longer invoke federal-court jurisdiction solely 'on the ground of their Federal origin;' instead, for federal jurisdictional purposes, Congress placed national banks 'on the same footing as the banks of the state where they were located.'" *Id.* at 309-10 (citations omitted).

The Court further explained that, "[i]n 1887 revisions to prescriptions on federal jurisdiction, Congress replaced the 1882 provision on jurisdiction over national banks and first used the 'located' language today contained in § 1348. . . . Like its 1882 predecessor, the 1887 Act 'sought to limit . . . the access of national banks to, and their suability in, the federal courts to the same extent to which non-national banks [were] so limited.'" *Id.* at 310-11.  Addressing the precise question before it, the Court noted that "[n]ot until 1994 did Congress provide broad authorization for national banks to establish branches across state lines." *Id.* at 314.  Considering Congress' purpose of achieving jurisdictional parity between state and national banks, and the fact that the relevant language in § 1348 was placed in the statute at a time when national banks could not operate branches outside their home state, the Court held that

"a national bank, for § 1348 purposes, is a citizen of the State in which its main office, as set forth in its articles of association, is located.  Were we to hold, as the Court of Appeals did, that a national bank is additionally a citizen of every State in which it has established a branch, the access of a federally chartered bank to a federal forum would be drastically curtailed in comparison to the access afforded state banks and other state-incorporated entities.  Congress, we are satisfied, created no such anomaly." *Id.* at 307.

The Court did not decide whether, given the imprecision of the word "located," a national bank might also be "located," for purposes of § 1348, in the state where it maintains its principal place of business. Indeed, it specifically noted that in the case before it, the bank's principal place of business was its main office. It stated:

> "To achieve complete parity with state banks and other state-incorporated entities, a national banking association would have to be deemed a citizen of both the State of its main office and the State of its principal place of business. Congress has prescribed that a corporation 'shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business.' 28 U.S.C. § 1332(c)(1). The counterpart provision for national banking associations, § 1348, however, does not refer to 'principal place of business;' it simply deems such associations 'citizens of the States in which they are respectively located.' The absence of a 'principal place of business' reference in § 1348 may be of scant practical significance for, in almost every case, as in this one, the location of a national bank's main office and of its principal place of business coincide." *Id.* at 317 n. 9 (additional citation omitted)."

### ii.    Whether Wells Fargo Is a Citizen of California

In the absence of guidance from either the Supreme Court or the Ninth Circuit, district courts in the circuit have reached conflicting conclusions regarding the citizenship of national banks. Compare *Goodman v. Wells Fargo Bank, NA*, No. CV 11–2685 JFW (RZx), 2011 WL 2372044, *2 (C.D. Cal. June 1, 2011) (remanding after concluding that Wells Fargo was a citizen of California, where it has its principal place of business, and that its citizenship was not diverse from that of a California plaintiff); *Saberi v. Wells Fargo Home Mortg.*, No. 10CV1985 DMS (BGS), 2011 WL 197860, *3 (S.D. Cal. Jan. 20, 2011) ("Accordingly, for purposes of diversity jurisdiction, Wells Fargo Bank is both a citizen of South Dakota, where it has designated its main office, and California, where it has its principal place of business"); *Mount v. Wells Fargo Bank, N.A.*, No. CV 08-6298 GAF (MANx), 2008 WL 5046286, *2 (C.D. Cal. 2008) (holding that Wells Fargo is a citizen of the state where it has its principal place of business and the state where

33

its main office is located) with *Tse v. Wells Fargo Bank, N.A.*, No. C10-4441 TEH,.2011 WL 175520, *2 (N.D. Cal. Jan. 19, 2011) ("[T]he test for a national bank's citizenship under section 1348 is determined solely by the location of its main office designated in its articles of association"); *Cochran v. Wachovia Bank, N.A., et al.*, Case No. CV 10-018 CAS (AGRx), 2010 U.S. Dist. LEXIS 38379 (C.D. Cal. Mar. 9, 2010) (concluding that a national bank was a citizen only of the state in which its main office is located); *DeLeon v. Wells Fargo Bank, N.A.*, 729 F.Supp.2d 1119, 1124 (N.D.Cal. 2010) ("[T]he Court concludes that Wells Fargo is a citizen of the state in which its main office, as specified in its articles of association, is located"); *Kasramehr v. Wells Fargo Bank N.A. et al.*, CV 11-0551 GAF (OPx) at 3 (reconsidering the position taken in *Mount* and concluding that Wells Fargo is a citizen only of the state in which it has its main office); *Nguyen v. Wells Fargo Bank, N.A.*, 749 F.Supp.2d 1022, 1028 (N.D. Cal. 2010) (" Wells Fargo is a citizen of the state in which it has designated its 'main office'").

Courts concluding that Wells Fargo is a California citizen, including this one,[115] have been swayed by the fact that § 1348 was intended to place national banks "on the same footing as the banks of the state where they were located." *Wachovia Bank*, 546 U.S. at 310. Focusing on Congressional intent, they have concluded that the citizenship of national banks should be coextensive with the citizenship of state banks. See *Horton v. Bank One, N.A.*, 387 F.3d 426, 431 (5th Cir. 2004) ("It follows that we should read section 1348 as retaining its objective of jurisdictional parity for national banks vis-á-vis state banks and corporations. . . . We are persuaded that this goal of jurisdictional parity is best served by interpreting 'located' as referring to a national bank's principal place of business as well as the state specified in the bank's articles

---

[115]In a prior case, this court decided, in ruling on an *ex parte* application to remand, that Wells Fargo was a citizen of California. *Stewart v. Wachovia Mortg. Corp.*, No. CV 11-06108 MMM (AGRx), 2011 WL 3323115, *6 (C.D. Cal. Aug. 2, 2011). In a later case, where the court had the benefit of fuller briefing, it reached the contrary conclusion. (See CV No. 11-05771 MMM (VBKx), Order Denying Plaintiff's Motion to Remand, Granting Defendant's Motion to Dismiss, Granting Defendant's Motion to Expunge Lis Pendens, Denying Plaintiff's Motion to File Supplemental Pleading to First Amended Complaint, Docket No. 19 (Nov. 1, 2011).)

1    of association"); *Mount*, 2008 WL 5046286 at *2 (concluding that a national bank was a citizen

2    of the state where its principal place of business was located because "this would place national

3    banks on the same footing as any other corporation"); *Stewart*, 2011 WL 3323115 at *5 ("Since

4    Congress wished national banks to have the same access to federal courts as state-chartered banks,

5    interpreting § 1348 so as to foreclose the possibility that a national bank is 'located' where it

6    maintains its principal place of business would not further Congress' purposes").

7         In *Excelsior Funds, Inc. v. JP Morgan Chase Bank, N.A.*, 470 F.Supp.2d 312 (S.D.N.Y.

8    2006), however, one court offered a compelling counter-argument refuting this reasoning.

9    Recognizing Congress's intent to create parity, the *Excelsior* court noted that at the time § 1348

10   was enacted, a state bank was only a citizen of a single state: the state in which it was

11   incorporated. *Id.* at 319.   As a result, jurisdictional parity at the time the statute was passed was

12   achieved by limiting a national bank's citizenship to a single location.   The concept that a

13   corporation was a citizen of the state where it had its principal place of business did not arise until

14   1958, when 28 U.S.C. § 1332(c)(1) was first enacted.  See An Act of July 25, 1958, Pub.L. No.

15   85-554, 72 Stat. 415; S.Rep. No. 85-1830 (1958), as reprinted in 1958 U.S.C.C.A.N. 3099,

16   3101-02; *Excelsior*, 470 F.Supp.2d at 319.   Reasoning that the most relevant time period for

17   determining the meaning of a statute is the time it was enacted, the *Excelsior* court concluded that

18   the citizenship of national banks did not remain permanently tethered to the citizenship of state

19   banks, and that Congressional expansion of the state banks' citizenship in 1958 did not result in

20   a corresponding expansion of the citizenship of national banks. *Id.* (adding that "[i]f Congress

21   intended to achieve jurisdictional parity between national and state banks for all time[ ] in § 1348,

22   and thus to include principal place of business as a location for a national bank when it became

23   a basis for citizenship for a state bank, Congress could have provided for that in the statutory

24   language").  The court continued: "In fact, the language that expressly established parity between

25   national banks and state banks was removed in 1887, when the language was changed to create

26   jurisdictional parity between national banks and 'individual citizens.'" *Id.* at 320.  This suggests,

27   the court concluded, that "the concept of jurisdictional parity underlying the statute is more

28   limited, based on the then-existing understanding of citizenship, which would have been a single

state for either state banks or individual citizens." *Id.*

The court finds this analysis persuasive.[116]   While it recognizes that Congress' original intent in adopting § 1348 was to achieve parity between state and national banks, one can only speculate as to what Congress' intent would have been had it known that the citizenship of state banks would be changed decades in the future.   At the time Congress attempted to create jurisdictional parity between state and national banks, state banks could be sued only where they were incorporated.   The best analog to this location is the state designated in a national bank's articles of association as the location of its main office.   As a result, the court concludes that Wells Fargo is a citizen only of South Dakota, not California.   Because Wells Fargo is not a California citizen, its citizenship is diverse from plaintiffs'.[117]

---

[116]Plaintiffs' reliance on *Horton v. Bank One, N.A.*, 387 F.3d 426, 436 (5th Cir. 2004), and *Firstar Bank, N.A. v. Faul*, 253 F.3d 982, 984 (7th Cir. 2001), is misplaced.   While those cases contained language suggesting that a national banking association may be a citizen both of its state of incorporation and the state of its principal place of business, the holdings in *Horton* and *Firstar* addressed whether a national bank is a citizen of every state in which it operates a branch. As noted, the Supreme Court decided that issue in *Wachovia*, and the Seventh Circuit subsequently revisited its earlier holding in *Hicklin Engineering, L.C. v. Bartell*, 439 F.3d 346, 348 (7th Cir. 2006), concluding that banks were not citizens of all states where they had branches.

[117]In their opposition, plaintiffs contend that Wells Fargo has "judicially admitted" that its principal place of business is California.   Plaintiffs cite two district court cases in which Wells Fargo alleged in its complaint that its principal place of business was in California.   See *Wells Fargo Bank, N.A. v. Siegel*, No. 05 C 5635, 2005 WL 3482236, *2 (N.D. Ill. Dec. 15, 2005); *Jojola v. Wells Fargo Bank*, No. C71–900 SAW, 1973 WL 158166, *1 (N.D. Cal. May 2, 1973). Assuming Wells Fargo admitted that fact, the admission is irrelevant for purposes of determining whether its citizenship, as the analysis set forth above indicates.

Plaintiffs appear, moreover, to be invoking the doctrine of judicial *estoppel*, rather than judicial *admission*.   Under the doctrine of judicial estoppel, "'absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory.'"   *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).   "[F]ederal law governs the application of judicial estoppel in federal court." *Rissetto v. Plumbers and Steamfitters Local 343*, 94 F.3d 597, 603 (9th Cir. 1996).   The doctrine applies to positions taken in the same or different actions.   See *id.* at 605 ("We now make it explicit that the doctrine of judicial estoppel is not confined to inconsistent positions taken in the same litigation").   It also "applies to a party's stated position whether it is an expression of intention, a statement of fact, or a legal assertion."   *Wagner v. Professional Engineers in California Government*, 354 F.3d 1036, 1044 (9th Cir. 2004) (citing *Helfand v. Gerson*, 105 F.3d

1

### iii.     Whether Cal-Western Has Been Fraudulently Joined

2        The complaint also pleads claims against Cal-Western, which is allegedly a California

3    citizen.[118]   Defendants assert that Cal-Western is fraudulently joined, and therefore should be

4

5    ─────────────────

6    530, 535 (9th Cir. 1997)).  Judicial estoppel leads to a determination on the merits that a party
     cannot assert a position inconsistent with one taken in prior litigation.  See, e.g., *Elston v.*

7    *Westport Ins. Co.*, No. 05-16728, 2007 WL 3268429, *2 (9th Cir. Nov. 6, 2007) (Unpub. Disp.)
     (affirming the district court's entry of summary judgment against the plaintiff on the basis that her

8    claims were barred by judicial estoppel).

9        Factors relevant in deciding whether to apply the doctrine include: (1) whether a party's
     later position is "clearly inconsistent" with its earlier position; (2) whether the party has

10   successfully advanced the earlier position, such that judicial acceptance of an inconsistent position
     in the later proceeding would create a perception that either the first or the second court had been

11   misled; and (3) "whether the party seeking to assert an inconsistent position would derive an

12   unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New
     Hampshire*, 532 U.S. at 751 (citations omitted).  In addition to these factors, the Ninth Circuit

13   examines "whether the party to be estopped acted inadvertently or with any degree of intent."
     *EaglePicher Inc. v. Federal Ins. Co.*, CV 04-870 PHX MHM, 2007 WL 2265659, *3 (D. Ariz.

14   Aug. 6, 2007) (citing *Johnson v. Oregon Dep't of Human Resources Rehab. Div.*, 141 F.3d 1361,

15   1369 (9th Cir. 1998)).

16       To invoke judicial estoppel, plaintiffs would have to demonstrate that Wells Fargo has
     argued that it is a citizen both of the state in which it has its principal place of business and the

17   state in which its main office is located.  They would also have to show that those courts relied

18   on Wells Fargo's arguments in determining that they either had or lacked jurisdiction.  Plaintiffs
     have adduced no evidence that either factor is true, as the cited cases and pleadings state only that

19   Wells Fargo alleged that its principal place of business was in California.  In *Siegel*, for example,
     the district court stated that Wells Fargo's complaint alleged that its principal place of business

20   was in California and that its operational center was South Dakota.  2005 WL 3482236 at *2.  The

21   court interpreted the allegations as asserting that Wells Fargo was "a citizen of both California and
     South Dakota."  *Id.*  Putting aside whether Wells Fargo intended to represent that it was a citizen

22   of both states for jurisdictional purposes, the crucial issue in *Siegel* was the same one the Supreme
     Court addressed in *Wachovia*, i.e., whether a national banking association was a citizen of any

23   state where it had a branch.  *Id.*  The *Siegel* court thus had no occasion to determine whether

24   Wells Fargo was a citizen of the state where it had its principal place of business.  Plaintiffs have
     adduced no evidence either that Wells Fargo has argued that it is a citizen of the state in which it

25   has its principal place of business nor that a court relied on such an argument in reaching a result
     favorable to Wells Fargo.  It has adduced evidence only that Wells Fargo has alleged that its

26   principal place of business is in California.  Wells Fargo has not denied this fact in this litigation,

27   and as noted, it is not relevant in determining its citizenship for jurisdictional purposes.

28       [118]Complaint, ¶ 162.

37

disregarded for the purposes of determining complete diversity.[119]

"It is a commonplace that fraudulently joined defendants will not defeat removal on diversity grounds." *Ritchey v. Upjohn Drug Co.*, 139 F.3d 1313, 1318 (9th Cir. 1998) (citing *Emrich*, 846 F.2d at 1193 & n. 1 and *McCabe v. General Foods Corp.*, 811 F.2d 1336, 1339 (9th Cir.1987)). A non-diverse defendant is fraudulently joined and its citizenship is disregarded "[i]f the plaintiff fails to state a cause of action against the [non-diverse] defendant, and the failure is obvious according to the settled rules of the state. . . ." *Hamilton Materials, Inc.v. Dow Chemical Co.*, 494 F.3d 1203, 1206 (9th Cir. 2007) (quoting *McCabe,* 811 F.2d at 1339). "Fraudulent joinder must be proven by clear and convincing evidence." *Id.* (citing *Pampillonia v. RJR Nabisco, Inc.*, 138 F.3d 459, 461 (2d Cir.1998)). Because courts must resolve all doubts against removal, a court determining whether joinder is fraudulent "must resolve all material ambiguities in state law in [the] plaintiff's favor." *Macey v. Allstate Property and Cas. Ins. Co.*, 220 F.Supp.2d 1116, 1117 (N.D. Cal. 2002) (citing *Good v. Prudential*, 5 F.Supp.2d 804, 807 (N.D.Cal.1998)). Thus, "[i]f there is a non-fanciful possibility that plaintiff can state a claim under [state] law against the non-diverse defendants[,] the court must remand." *Id.*

"If the plaintiff fails to state a cause of action against a resident defendant, and the failure is obvious according to the settled rules of the state, the joinder of the resident defendant is fraudulent. . . . Where fraudulent joinder is an issue, . . . [t]he defendant seeking removal to the federal court is entitled to present the facts showing the joinder to be fraudulent." *Ritchey*, 139 F.3d at 1318 (citations omitted). Demonstrating fraudulent joinder, however, requires more than merely showing that plaintiff has failed to state a claim for relief. See *Latino v. Wells Fargo Bank, N.A.*, No. 2:11–cv–02037–MCE–DAD, 2011 WL 4928880, *3 (E.D. Cal. Oct. 17, 2011) ("[W]hile Removing Defendants may believe Plaintiff cannot state a claim against Cal–Western, they have failed to show that Cal–Western has been joined in a merely nominal capacity"). "In the Ninth Circuit, a non-diverse defendant is deemed to be fraudulently joined if, after all disputed questions of fact and all ambiguities in the controlling state law are resolved in the plaintiff's

---

[119]Removal, ¶ 31.

38

favor, the plaintiff *could not possibly recover* against the party whose joinder is questioned." *Sun v. Bank of America Corp.*, No. SACV 10-0004 AG (MLGx), 2010 WL 454720, *3 (C.D.Cal. Feb. 8, 2010) (emphasis added, citing *Kruso v. Int'l Tel. & Tel. Corp.*, 872 F.2d 1416, 1426 (9th Cir.1989)).   Defendants must show that the relevant state law is so well settled that plaintiff "would not be afforded leave to amend his complaint to cure th[e] purported deficiency." *Burris v. AT&T Wireless, Inc.*, No. C 06-02904 JSW, 2006 WL 2038040, *2 (N.D. Cal. Jul. 19, 2006); *Nickelberry v. DaimlerChrysler Corp.*, No. C-06-1002 MMC, 2006 WL 997391, *1 (N.D. Cal. Apr. 17, 2006) ("DCC has failed to show that, under California law, Nickelberry would not be afforded leave to amend her complaint to address the purported pleading deficiency on which DCC relies").

Defendants argue that plaintiffs refer to Cal-Western only once in their 84-page complaint. That allegation does nothing more than refer to Cal-Western's citizenship.[120]   Defendants adduce evidence that Cal-Western "[was] merely the trustee of the deeds of trust," and that "its contractual duties [were] limited by state law."[121]   Because of the dearth of factual allegations concerning Cal-Western, and the limited nature of its role as trustee, defendants assert that it cannot be held liable on any of plaintiffs' claims, and that it was fraudulently joined as a result.

The sufficiency of plaintiffs' current allegations against Cal-Western is questionable, given

---

[120]Complaint, ¶ 162.

[121]Removal, ¶ 33; Declaration of Drew A. Robertson in Support of Defendant's Notice of Removal ("Robertson Decl."), Docket No. 3 (Sept. 16, 2011), Exh. A (Declaration of Non-Monetary Status by Cal-Western ("Cal-Western Decl."), ¶¶ 3-5 (stating the company's belief that it was named in the lawsuit solely in its capacity as trustee, and not due to wrongful acts or omissions arising out of its performance as trustee).   Under California law, when a trustee has been named in an action solely in its capacity as trustee, it may file a declaration of "non-monetary status."   If no party opposes the declaration within fifteen days, the trustee is not required to participate in the action, and is not liable for damages or costs awarded in the action.   See CAL. CIV. CODE 2924; *Couture v. Wells Fargo Bank, N.A.*, No. 11–CV–1096–IEG (CAB), 2011 WL 3489955, *3 n. 2 (S.D. Cal. Aug. 9, 2011).   Cal-Western filed a declaration of non-monetary status in state court on September 2, 2011.   (Cal-Western Decl. at 1.)   Plaintiffs filed objection to the declaration on September 16, 2011, the same date defendants removed the action to federal court.   (Request for Judicial Notice in Support of Motion to Remand ("Remand RJN"), Docket No. 14 (Oct. 14, 2011).)

that the only specific reference to Cal-Western in the complaint concerns its citizenship, and given that plaintiffs make frequent use throughout the complaint of the plural "defendants," failing to specify which particular defendant or defendants were involved in the allegedly unlawful conduct. The complaint does assert, however, that all defendants were engaged in a conspiracy to defraud plaintiffs and that they are jointly and severally liable with one another as a result.[122] "Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration." *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal.4th 503, 510-11 (1994). "By participation in a civil conspiracy, a coconspirator effectively adopts as his or her own the torts of other coconspirators within the ambit of the conspiracy." *Id.* at 511 (citing *Wyatt v. Union Mortgage Co.*, 24 Cal.3d 773, 784 (1979). "In this way, a coconspirator incurs tort liability co-equal with the immediate tortfeasors." *Id.* See also *Vieux v. East Bay Regional Park District*, 906 F.3d 1330, 1343 (9th Cir. 1990) ("A civil conspiracy is a combination 'of two or more persons who, by some concerted action, intend to accomplish some unlawful objective for the purpose of harming another which results in damage'"); *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1020 (9th Cir. 1985) (stating that to prove civil conspiracy, the alleged conspirators must have reached "a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement"), cert. denied, 474 U.S. 1059 (1986).

Although the court does not presently decide the sufficiency of plaintiffs' conspiracy allegations, it does note that under a conspiracy theory, all defendants could be held responsible for the acts of their co-conspirators, so long as those acts were undertaken in furtherance of the conspiracy. As a result, it is untrue that the complaint lacks allegations that could result in Cal-Western being held liable for the wrongful conduct charged.[123]

---

[122]Complaint, ¶¶ 164-69.

[123]The court is mindful of the rule articulated by the California Supreme Court in *Doctors' Co. v. Superior Court*, 49 Cal.3d 39, 44 (1989), and *Applied Equipment Corp. v. Litton Saudi*

Defendants contend, however, that as a trustee, Cal-Western is immunized as a matter of law from liability on tort causes of action.  "[A] trustee's actions in executing a non-judicial foreclosure are privileged communications under Cal. Civ. Code section 47, and as such will not support a tort claim other than one for malicious prosecution." *Champlaie v. BAC Home Loans Servicing, LP*, 706 F.Supp.2d 1029, 1062  (E.D.Cal. 2009) (citing CAL. CIV. CODE §§ 47, 2924(d) and *Kachlon v. Markowitz*, 168 Cal.App.4th 316, 333, (2008)); see also *Canales v. Federal Home Loan Mortg. Corp.*, No. CV 11–2819 PSG (VBKx), 2011 WL 3320478, *3 (C.D.Cal. Aug. 1, 2011) ("California law clearly provides that a trustee's actions in executing a non-judicial foreclosure are privileged communications under Cal. Civ. Code § 47 and will not support a tort claim other than one for malicious prosecution, which is not alleged here"); *Sherman v. Wells Fargo Bank, N.A.*, No. CIV S–11–0054 KJM EFB, 2011 WL 1833090, *2-3 (E.D. Cal. May 12, 2011) ("In California, the trustee's duties are limited to those imposed by statute and by the contract, namely to foreclose upon default and to reconvey the deed of trust upon satisfaction of the secured debt; the trustee does not act as a fiduciary, but rather as common agent for the trustor and beneficiary of the deed of trust.  The underlying complaint does not allege that Cal Western violated any statutory or contractual duties it owed to plaintiffs" and thus, "the court finds that Cal–Western was fraudulently joined for diversity purposes").

Most of plaintiffs' claims sound in tort, making them subject to California Civil Code 47.[124]

---

*Arabia Ltd.*, 7 Cal.4th 503, 514 (1994), that a party cannot be held liable for conspiracy unless it was "personally bound by the duty violated by the wrongdoing. . . ." *Doctors' Co.*, 49 Cal.3d at 44; see also *Applied Equipment*, 7 Cal.4th at 514 ("[Conspiracy] allows tort recovery only against a party who already owes the duty and is not immune from liability based on applicable substantive tort law principles").  Here, Cal-Western owed an independent duty not to engage in fraud or make misrepresentations.

[124]Plaintiffs appear to concede that their fraudulent concealment, intentional misrepresentation, and negligent misrepresentation claims are tort causes of action that, to the extent asserted against Cal-Western, are barred by Civil Code § 47.  Their reply, in fact, offers no argument regarding these claims.  (Reply at 21-22.)  Similarly, plaintiffs' breach of contract claim does not allege that plaintiffs had a contract with Cal-Western; their reply does not address the issue.  As the existence of a contract is one of the elements of a breach of contract claim, it appears that this claim cannot proceed against Cal-Western.  See *Appling v. Wachovia Mortgage*,

The privilege of a trustee is not absolute, however. As the California Court of Appeal explained,

> "The overall balance of interests reflected in the statutory scheme, however, favors protection of trustors' property rights, thus suggesting that trustors should not be entirely deprived of the ability to vindicate their property rights if wrongfully violated by the trustee. Granting absolute immunity from such wrongdoing would wholly sacrifice the trustor's interest in favor of the trustee. The qualified common interest privilege, on the other hand, would provide a significant level of protection to trustees, leaving them open to liability only if they act with malice. At the same time, it preserves the ability of trustors to protect against the wrongful loss of property caused by a trustee's malicious acts." *Kachlon*, 168 Cal.App.4th at 340.

Plaintiffs' wrongful foreclosure claim alleges that "[d]efendants acted outrageously and persistently with actual malice in performing the acts alleged in this cause of action."[125] While the allegations concerning actual malice are thin, "[m]alice . . . may be alleged generally." FED.R.CIV.PROC. 9(b). Plaintiffs' assertion that defendants, including Cal-Western, acted with actual malice suggests that Cal-Western's actions were not privileged, and it is not immune from suit, as a matter of law. See *Ritchey*, 139 F.3d at 1318 (noting that in order to demonstrate that defendants were fraudulently joined, defendants had to show that "the individuals joined in the action cannot be liable on any theory"); see also *Couture*, 2011 WL 3489955 at *3 (rejecting Wells Fargo's argument that "Cal–Western is a nominal party because (1) it is 'merely the foreclosure trustee,' and (2) "there are no substantive allegations against Cal–Western,'" quoting the notice of removal)); cf. *Silva v. Wells Fargo Bank, NA*, No. CV 11–3200 GAF (JCGx), 2011 WL 2437514, *5 (C.D. Cal. June 16, 2011) ("Removing Defendants might argue that Cal–Western is immune from liability for these actions under California Civil Code section 2924, which immunizes trustees from liability for claims in connection with executing a nonjudicial foreclosure. . . . [I]t is unclear whether this argument would prevail in any event: It is unclear

---

*FSB*, 745 F.Supp.2d 961, 974 (N.D. Cal. 2010).

[125]Complaint, ¶ 375.

whether these provisions would also apply where, as here, the plaintiff alleges that the foreclosing trustee was not actually the trustee authorized to initiate non-judicial foreclosure proceedings"). Consequently, the court cannot say that there is no possibility that plaintiffs can state a claim against Cal-Western.[126]

Defendants also argue that plaintiffs' UCL claim fails because plaintiffs lack standing to assert such a claim.  See *Daro v. Superior Court*, 151 Cal.App.4th 1079, 1097-98 (2007) (explaining that Proposition 64 modified the UCL's standing requirement "to provide that a private person has standing to sue only if he or she 'has suffered injury in fact and has lost money or

---

[126]Given this conclusion, the court declines to address defendants' arguments regarding the sufficiency of the wrongful foreclosure allegations.  Defendants correctly assert, however, that plaintiffs' wrongful foreclosure claim fails to the extent it is based on a theory that the foreclosing party must possess the original note to initiate a non-judicial foreclosure sale.  See, e.g., *Maguca v. Aurora Loan Serv.*, CV No. 09-1086 JVS (ANx), 2009 WL 3467750, *3 (C.D. Cal. Oct. 28, 2009) ("Under California Civil Code section 2924, 'no party needs to physically possess the promissory note.'  Rather, '[t]he foreclosure process is commenced by the recording of a notice of default and election to sell by the trustee.' . . .  A 'person authorized to record the notice of default or the notice of sale' includes 'an agent for the mortgagee or beneficiary, an agent of the named trustee, any person designated in an executed substitution of trustee, or an agent of that substituted trustee'" (internal citations omitted)); *Sicairos v. NDEX West, LLC*, CV No. 08-2014 LAB (BLM), 2009 WL 385855, *3 (S.D. Cal. Feb. 13, 2009) ("Under Civil Code section 2924, no party needs to physically possess the promissory note.  See Cal. Civ. Code § 2924(a)(1). Rather, "[t]he foreclosure process is commenced by the recording of a notice of default and election to sell by the trustee," citing *Moeller v. Lien*, 25 Cal.App.4th 822, 830 (1994)); *Putkkuri v. Recontrust Co.*, CV No. 08-1919 WQH (AJB), 2009 WL 32567, *2 (S.D. Cal. Jan. 5, 2009) ("Pursuant to section 2924(a)(1) of the California Civil Code, the trustee of a Deed of Trust has the right to initiate the foreclosure process.  CAL. CIV.CODE § 2924(a).  Production of the original note is not required to proceed with a non-judicial foreclosure").

Plaintiffs counter that their wrongful foreclosure claim is not based on the fact that defendants failed physically to produce the note, but on the fact that defendants are not the lawful *holders* of the note.  (Complaint, ¶¶ 369, 373.)  In their opposition, plaintiffs cite *Kelley v. Upshaw*, 39 Cal.2d 179 (1952), for the proposition that "assignment of the mortgage without an assignment of the debt which is secured [is] a legal nullity."  *Id.* at 192.  This citation suggests that plaintiffs contend the deeds of trust were improperly assigned.

This assertion appears inconsistent with factual allegations that defendants fraudulently induced plaintiffs to enter into mortgage agreements with them.  The mass of allegations in the complaint, however, makes it difficult to ascertain the theory underlying the wrongful foreclosure claim, and amendment may cure any deficiencies that exist.

property as a result of such unfair competition,'" quoting CAL. BUS. & PROF. CODE § 17204)). "In order to have standing to sue under section 17204, it is not enough for a private person to have suffered an injury in fact. . . .  [A] private person has no standing under the UCL unless that person can establish that the injury suffered and the loss of property or money resulted from conduct that fits within one of the categories of 'unfair competition' in section 17200." *Id.*

Defendants rely heavily on the California Court of Appeal's decision in *Bank of America Corp. v. Superior Court*, 198 Cal.App.4th 862 (2007), where plaintiffs pled a fraudulent misrepresentation claim based on an allegation that "defendants failed to disclose to plaintiffs/borrowers that defendants 'knowingly pooled their secretly risky loans into pools they sold above fair value, defrauding their investors.'" They also asserted that "[t]he 'unraveling of the Defendants' fraudulent scheme ha[d] materially depressed the price of real estate throughout California, including the real estate owned by Plaintiffs[.]'" *Id.* at 871.  Plaintiffs disavowed any suggestion that they alleged the loans they had received were unaffordable or the loan disclosures fraudulent. *Id.* Therefore, their claim was based on defendants' lax underwriting practices and scheme to inflate property values throughout California, on their pooling of mortgages and their sale of the pooled mortgages to unsuspecting investors. *Id.* The *Bank of America* court concluded that plaintiffs had failed adequately to plead a causal nexus between defendants' conduct and their alleged injury, which was the reduction in the value of their homes, their lack of access to equity lines of credit, and their reduced credit scores.  The court held that "[t]he defect in [plaintiffs'] allegation [was] that homeowners who did not obtain loans from Countrywide likewise suffered a decline in property values, a decline in their home equity, and reduced access to their home equity lines of credit. . . .  [A]ll suffered a loss of home equity due to the generalized decline in home values." *Id.*  Consequently, the court concluded that plaintiffs could demonstrate "no nexus between the alleged fraudulent concealment by Countrywide and the economic harm which these plaintiffs/borrowers have suffered." *Id.*

Defendants contend that *Bank of America* controls, since plaintiffs are proceeding on a similar theory.  The court disagrees.  First, plaintiffs' UCL claim pleads different forms of injury. Plaintiffs allege that they have experienced "reduced credit scores, unavailability of credit,

increased costs of credit, reduced availability of goods and services tied to credit ratings . . . [and incurred] attorneys' fees and costs,"[127] as well as other "monetary and property loss," including "loss of some or all of the benefits appurtenant to the ownership and possession of real property."[128]   Plaintiffs, however, cannot recover damages under the UCL.  See *Kaldenbach v. Mutual of Omaha Life Ins. Co.*, 178 Cal.App.4th 830, 847 (2009) ("Although a private citizen can sue under the UCL, only equitable remedies are available (e.g., injunction, restitution), and damages are not an available remedy").  The relevant question, therefore, is the nature of the restitution plaintiffs seek.  Here, plaintiffs allege that they are entitled to recoup "interest payments made by Plaintiffs, fees paid to Defendants, including . . . the excessive fees paid at Defendants' direction  .  .  .  , and premiums received upon selling the mortgages at an inflated value."[129]  Plaintiffs also seek injunctive relief to prevent defendants from violating the numerous statutes on which they UCL claim is allegedly based.  Unlike the type of relief sought in *Bank of America*, the restitution plaintiffs seek is directly tied to the fact that they obtained mortgages from defendants.

The *Bank of America* court, moreover, "emphasiz[ed] the limited nature of [its] holding," which was only that plaintiffs had failed to state a cause of action for fraudulent concealment because they had not adequately pled duty or causation.  *Id.* at 873.  Defendants' attempt to use this limited holding to argue that plaintiffs lack standing under UCL fails.  Plaintiffs have clearly alleged that they "suffered injury in fact and . . . lost money or property as a result of [defendants' purported acts of] unfair competition."  CAL. BUS. & PROF. CODE § 17204.  They have thus sufficiently pled that they have standing to sue under the UCL.  See *Nelson v. Pearson Ford Co.*, 186 Cal.App.4th 983, 1014 (2010) ("The actual payment of money by a plaintiff, as wrongfully required by a defendant, 'constitute[s] an 'injury in fact' for purposes of Business and Professions Code section 17204,'" quoting *Troyk v. Farmers Group, Inc.*, 171 Cal.App.4th 1305, 1347

---

[127]Complaint, ¶ 355.

[128]*Id.*, ¶ 358.

[129]*Id.*, ¶ 360.

(2009); see also *Pinel v. Aurora Loan Services, LLC*, __ F.Supp.2d __, 2011 WL 3843960, *9 (N.D. Cal. Aug. 30, 2011) ("A plaintiff suffers an injury in fact for purposes of prudential standing under the UCL when he or she has: (1) expended money due to the defendant's acts of unfair competition (2) lost money or property or (3) been denied money to which he or she has a cognizable claim"); cf. *In re Tobacco II Cases*, 46 Cal.4th 298, 306 (2009) (holding that while UCL fraud prong should be construed in concordance with "well-settled principles regarding the element of reliance in ordinary fraud actions," those principles "do not require the class representative to plead or prove an unrealistic degree of specificity that the plaintiff relied on particular advertisements or statements when the unfair practice is a fraudulent advertising campaign").

Defendants also complain that certain of the statutes on which plaintiffs' UCL claim is based do not support the cause of action.  Specifically, they contend that plaintiffs' citation of California Civil Code § 2923.5 is insufficient,[130] since the only remedy for a violation of § 2923.5 is a delay of the foreclosure sale, not the vacating of a completed sale.  See *Mabry v. Superior Court*, 185 Cal.App.4th 208, 235 (2010) ("We would merely note that under the plain language of section 2923.5, read in conjunction with section 2924g, the only remedy provided is a postponement of the sale before it happens").  While it appears that the properties of the plaintiffs asserting a wrongful foreclosure claim have already been sold, the fact that the sales violated § 2923.5, if they did, may satisfy the "unlawful" prong of the UCL, and provide plaintiffs a right to restitutionary relief.  See *Latino v. Wells Fargo Bank, N.A.*, No. 2:11–cv–02037–MCE–DAD, 2011 WL 4928880, *5 (E.D. Cal. Oct. 17, 2011) ("Removing Defendants therefore bear the burden of showing that it is both 'well-settled' and 'obvious' that Plaintiff cannot possibly state a claim against Cal–Western. . . .  Defendants ignore, among other things, Plaintiff's allegations that all Defendants, including Cal–Western, participated in a massive scheme intended to defraud Plaintiff out of his Property and that Defendants, among other things, failed to adhere to the

---

[130]Complaint, ¶¶ 350-51.  The UCL claim also relies on violations of TILA, the USA Patriot Act, the Fair Credit Reporting Act, the California Financial Information Privacy Act, and other constitutional and statutory provisions.

requirements of California Civil Code § 2923.5 in foreclosing on the Property, thus resulting in a violation of California Business and Professions Code § 17200.  Accordingly, this Court finds Removing Defendants have failed to meet their burden of showing there is no possibility Plaintiff could establish a cause of action against Cal–Western, and thus, the Court finds no fraudulent joinder").

Consequently, defendants have not met their burden of demonstrating that Cal-Western was fraudulently joined in this action.  They have, as a consequence, failed to show that there is complete diversity of citizenship between plaintiffs and defendants.

        **b.**     **Whether Defendants Have Met Their Burden of Demonstrating Amount in Controversy**

Diversity jurisdiction is lacking for another reason as well, i.e., that defendants have failed to demonstrate that the amount in controversy on each plaintiff's claims exceeds $75,000.  As noted, when a complaint is silent regarding the amount in controversy, defendants bear the burden of proving, by a preponderance of the evidence, that the jurisdictional threshold is met. See, e.g., *Lowdermilk*, 479 F.3d at 997 ("[W]hen the plaintiff fails to plead a specific amount of damages, the defendant seeking removal 'must prove by a preponderance of the evidence that the amount in controversy requirement has been met,'" quoting *Abrego Abrego*, 443 F.3d at 683); *Matheson*, 319 F.3d at 1090 ("Where it is not facially evident from the complaint that more than $75,000 is in controversy, the removing party must prove, by a preponderance of the evidence, that the amount in controversy meets the jurisdictional threshold").  In addition to the notice of removal, the court considers "'summary-judgment-type evidence relevant to the amount in controversy at the time of removal,'" such as affidavits or declarations.  *Valdez v. Allstate Insurance Co.*, 372 F.3d 1115, 1117 (9th Cir. 2004) (citation omitted).

As noted, plaintiffs' complaint is ambiguous regarding the amount in controversy in this litigation.  They plead only that "fewer than 100" plaintiffs allege an amount in controversy equal to or *above* the jurisdictional threshold of $75,000.  This allegation does not specify the amount in controversy on the claims of any individual plaintiff.  Nor, because it states that certain claims equal or exceed $75,000, does it affirmatively limit the claim of any plaintiff to an amount below

the jurisdictional threshold of $75,000. Additionally, "fewer than 100" could mean that no plaintiff alleges an amount in controversy above the jurisdictional threshold, or that 99 do. Thus, defendants must show that the amount in controversy requirement is met by a preponderance of the evidence.

The court previously addressed the deficiencies in defendants' amount in controversy arguments regarding CAFA mass action jurisdiction in Part II.A.3.a, *supra*. Similar problems bedevil their amount in controversy arguments regarding diversity jurisdiction. Once again, the only evidence defendants proffer is the Dolan declaration, which does not address the claims of eleven of the 108 plaintiffs. As to those individuals, therefore, defendants have adduced no evidence regarding the amount in controversy on their claims. As respects the remaining plaintiffs, Dolan states only that each "has, or at one time had, a mortgage loan with an outstanding principal balance in excess of $75,000."[131] For the reasons outlined earlier, defendants' assumption that all plaintiffs have placed the full value of their mortgages at issue is mistaken.

The only plaintiffs who have arguably placed the full value of their mortgage at issue are those who plead claims for wrongful foreclosure and breach of contract, i.e., those named in the fifth and sixth causes of action. The Dolan declaration provides information only for nine of the plaintiffs who have asserted a wrongful foreclosure claim; it provides no information concerning any plaintiff who asserts a breach of contract claim.[132] The deficiencies that caused the court to conclude that defendants had not proved the amount in controversy for purposes of CAFA mass action provisions compel the same conclusion with respect to defendants' assertion that there is diversity jurisdiction.

It is true that "[i]n actions seeking declaratory or injunctive relief, . . . the amount in controversy is measured by the value of the object of the litigation." *Hunt v. Washington State Apple Advertising Com'n*, 432 U.S. 333, 346-47 (1977). See also *Chapman v. Deutsche Bank*

---

[131]Dolan Decl., ¶ 12.

[132]*Id.*

*Nat. Trust Co.*, 651 F.3d 1039, 1045 n. 2 (9th Cir. 2011) ("Here, the object in litigation is the Property, which was assessed at a value of more than $200,000, and therefore satisfies the amount-in-controversy requirement"); *Garfinkle v. Wells Fargo Bank*, 483 F.2d 1074, 1076 (9th Cir. 1973) (treating the value of real property as the amount in controversy in an action to enjoin a foreclosure sale).

The Dolan declaration, however, provides no information regarding the value of any plaintiff's property or, indeed, the size of loan obtained by any plaintiff who has asserted a wrongful foreclosure claim. It states only that "at the time of those foreclosures, each loan had an unpaid principal balance in excess of $75,000."[133] Dolan does not provide any documentation regarding loan amounts or property values. While the preponderance standard is not overly demanding, defendants must make a greater showing than the meager evidence they have provided here.[134]

---

[133]*Id.*

[134]Given the court's conclusion, it need not address defendants' arguments that if the court has jurisdiction over the claims of the individuals who assert the fifth and sixth causes of action, it can exercise supplemental jurisdiction over the claims of the remaining plaintiffs under 28 U.S.C. § 1367(a). The court notes, however, that exercising supplemental jurisdiction as defendants suggest would be unwarranted.

When a federal claim is joined with state claims in the same action, the federal court has "supplemental jurisdiction over all other claims that are so related to [the federal] claim[ ] . . . that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). If "a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is power in federal courts to hear the whole." *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966).

Having the court exercise supplemental jurisdiction is not a matter of right, however. See *Gibbs*, 383 U.S. at 725. 18 U.S.C. § 1367(c) identifies four reasons why a district court may choose to decline supplemental jurisdiction:

"(1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction. . . ."

*Gibbs* noted that "if it appears that the state issues substantially predominate, whether in terms of

Finally, defendants' reliance on allegations in the complaint is unavailing.  The complaint alleges claims on behalf of 108 plaintiffs.  It pleads that "fewer than 100 plaintiffs are alleging claims or amounts in controversy that would, as to them[,] equal or exceed the jurisdictional amount for federal jurisdiction under 28 U.S.C. § 1332(a)."[135]  Defendants assert the reference to "fewer than 100 plaintiffs" means that at least *some* unspecified number of plaintiffs assert claims above the jurisdictional amount.   The court disagrees.   First, because the allegation states that "fewer than 100 plaintiffs" allege an amount in controversy that "equal[s] or exceed[s]" $75,000, it is unclear how many of the "fewer than 100 plaintiffs" actually satisfy the amount in controversy requirement.  To the extent their claims "equal" $75,000, they do not allege an amount in controversy that is sufficient to give rise to diversity jurisdiction.  See  28 U.S.C.

---

proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims *may* be dismissed without prejudice and left for resolution to state tribunals."  *Gibbs*, 383 U.S. at 726-27 (emphasis supplied).  See also *Matek v. Murat*, 862 F.2d 720, 732 (9th Cir. 1988) ("Judicial economy and fairness to the litigants is better served by dismissal of the [predominating] pendent state claims").   "Finally, there may be reasons independent of jurisdictional considerations, such as the likelihood of jury confusion in treating divergent legal theories of relief, that would justify separating state and federal claims for trial. . . .  If so, jurisdiction should ordinarily be refused."  *Gibbs*, 383 U.S. at 727 (citing FED.R.CIV.PROC. 42(b) ("For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims")).

Defendants cannot argue persuasively that the wrongful foreclosure claims of nine individuals predominate over the myriad claims of the remaining plaintiffs, who number almost 100.  While it is true that the complaint alleges a "common plan and scheme designed to conceal . . . material facts" from plaintiffs (Complaint, ¶ 163), the nine individuals who assert wrongful foreclosure and breach of contract claims seek a form of relief that is unavailable to the remaining plaintiffs.  The proof that will be required to prevail on their claims will be distinct and in large measure separate from the evidence that will be necessary to prove the remaining claims.

Defendants have not demonstrated that judicial economy and fairness would be served by requiring almost 100 plaintiffs who allege claims outside federal jurisdiction to litigate those claims in federal court.  This is especially true since their claims can just as easily be adjudicated in state court with no prejudice to any party.  Consequently, if the court were to reach the issue, it would decline to exercise supplemental jurisdiction over the claims of plaintiffs who do not assert a wrongful foreclosure or breach of contract claim.

[135]Complaint at 84 (emphasis added).

50

§ 1332(a) (diversity jurisdiction exists only "where the amount in controversy *exceeds* the sum or value of $75,000 exclusive of interest and costs. . ." (emphasis added)); Matheson, 319 F.3d at 1090 ("[J]urisdiction founded on [diversity grounds] requires that the parties be in complete diversity and the amount in controversy *exceed* $75,000" (emphasis added)).   Second, the statement that "fewer than 100 plaintiffs" allege claims that possibly meet the jurisdictional threshold could mean that *no* plaintiffs allege claims that equal or exceed $75,000; absent additional information, it is speculative to conclude that "fewer" means some number above zero.

    For all of these reasons, result, defendants have failed to meet their burden of demonstrating by a preponderance of the evidence that the claims of each individual plaintiff meet the jurisdictional threshold for diversity jurisdiction.

### III.  CONCLUSION

    For the reasons stated, the court grants plaintiffs' motion, and directs the clerk to remand the action to Los Angeles Superior Court forthwith.   The court denies defendants' motion to dismiss as moot.

DATED: January 11, 2012

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE